447 So.2d 469 (1984)
CHEVRON U.S.A. INC.
v.
MARTIN EXPLORATION COMPANY, Ken G. Martin, Bta Oil Producers, Cotton Petroleum Corporation, Thomas A. Durham, Herschell J. McCunn, Loren G. Horton, John O. Smith, Robert L. Brownlee, G.D. Ward and Gordon Smith.
No. 83-C-1543.
Supreme Court of Louisiana.
February 27, 1984.
Rehearing Denied March 23, 1984.
*470 M. Truman Woodward, Jr., John C. Christian, M. Taylor Darden, Milling, Benson, Woodward, Hillyer, Pierson & Miller, New Orleans, Patrick S. Ottinger, Plauche, Hartley, Lapeyre & Ottinger, Lafayette, David M. Ellison, Jr., Ellison & Smith, Batton Rouge, Nathaniel P. Phillips, James A. Babst, Chaffe, McCall, Phillips, Toler & Sarpy, New Orleans, for applicants.
Robert Redfearn, Steven A. Jacobson, Simon, Peragine, Smith & Redfearn, New Orleans, William S. Strain, Strain & Mayhall, Baton Rouge, Frederick B. Alexis, Provosty, Sadler & Delaunay, Alexandria, for respondents.
BLANCHE, Justice.
This case originated as an action by Chevron for a declaratory judgment on the issue of whether Martin Exploration had forfeited its interest in an oil and gas lease in Pointe Coupee Parish. Specifically at issue was the effect of a preliminary operating agreement between Chevron and Martin's assignor, Tomlinson, which provided for forfeiture of unit acreage for non-consenting parties. The trial court held that the preliminary agreement was binding on the parties, and found that since Martin did not enter into a subsequent agreement which modified the preliminary agreement, Martin's interest was forfeited when Martin refused to provide its share of the cost in the four wells drilled on the lease. The Court of Appeal, 1st Circuit, 432 So.2d 886, reversed, on the basis that the terms of the preliminary agreement indicated its temporary nature and the intent of the parties to agree later to a final, binding agreement. The essence of its holding was that the preliminary agreement was no more than an "agreement to agree" and since no final agreement was reached by the parties when the wells were drilled, Martin was not bound thereby. Chevron, BTA Oil Producers (hereafter referred to as `BTA') and Cotton Petroleum Corporation now seek review of this holding.

FACTS
The circumstances leading to this lawsuit began in 1975, when Chevron and Tomlinson Interests, a small independent oil company, agreed to jointly acquire a mineral lease over acreage described as the F. Evan Farwell tract. The agreement between Chevron and Tomlinson was confected by exchange of Telexes in October of 1975. In this exchange, the two companies *471 agreed to an arrangement whereby each company would own 50% of the lease, with Chevron to be named operator. Additionally, the parties agreed that if one of them did not consent to a drilling operation, the penalty would be forfeiture of unit acreage. The Farwell lease was then subsequently acquired on November 7, 1975.
On November 18, 1975, Tomlinson assigned 30% of the lease (or 60% of Tomlinson's interest) to BTA. This assignment was later modified to include 40%, in exchange for which BTA agreed to drill a test well on the leased acreage. The agreement between Tomlinson and BTA contained a number of explicit references to prior existing agreements. Among these was paragraph 10, which purported to condition the assignment to Tomlinson's arrangement with Chevron, in the following manner:
"10. Chevron Agreement. Tomlinson has advised BTA that preliminary agreement has been reached with Chevron as to joint operations to be conducted on acreage covered by the Farwell Lease or acreage pooled therewith, which preliminary agreement provides (i) that the penalty for a nonconsenting party to a proposed well is loss of unit acreage, insofar as Farwell Lease acreage is included in any such unit, or 640 acres in the absence of a unit with an acreage adjustment if a unit is later established, and (ii) for Chevron to be operator, except as to a well in which Chevron is a nonconsenting party. It is understood and agreed that following execution hereof, BTA shall join in such negotiations and shall be a party to the written agreement with Chevron finalizing the points listed above." (Emphasis added)
Tomlinson proceeded to divest itself of the remainder of its interest in the Farwell lease, in assignments to Cotton Petroleum (3%) in 1977, and Martin Exploration (7%) in 1978. The assignment from Tomlinson to Martin stipulated several agreements to which the assignment would be subject, including the November 18, 1975 agreement between Tomlinson and BTA. Further, in the assignment, Martin agreed to accept all the liabilities and obligations incurred by the assignor in the agreements listed.
Subsequent to Martin's acquisition of the 7% interest, Chevron, in its capacity as operator, drilled four wells on the Farwell lease. BTA, Cotton and Martin were all invited to join in the cost of the wells as working interest owners. BTA and Cotton did so, and entered into written operating agreements with Chevron for each well. Each of these operating agreements contained penalty provisions for non-consenting parties in the amount of 350% of their costs before the non-consenting party could participate in the production from the well. Martin refused to join any of the operating agreements and did not advance its share of the drilling costs.
In the trial court, Chevron and BTA argued that because Martin failed to participate in the operating agreements for any of the four wells drilled, his interest was controlled by the preliminary agreement, which provided for a forfeiture of unit acreage. Martin, on the other hand, maintained that the preliminary agreement mentioned in the assignment from Tomlinson to BTA was not a final agreement, and therefore, that Martin's interest in the acreage was not subject to any operating agreement or any penalty for non-consent.
The trial court found that Martin acquired his interest with full notice of the preliminary agreement, and the accompanying non-consent provision. The court further found that the preliminary agreement was a completed contract, even though it was described as preliminary. According to the trial court, characterization of an agreement as preliminary is not determinative of whether it was intended to be binding. In this case, the court reasoned, the parties desired to establish a basic working agreement, which could be modified in the future.
On appeal, the First Circuit reversed, finding that the use of the words "preliminary", "finalize" and "negotiations" in the letter agreement indicated a tenative, rather than final agreement. The Court of *472 Appeal found particularly significant the last sentence of Paragraph 10, which stated that BTA would join in negotiations and be a party to an agreement finalizing the terms listed in Paragraph 10. If the agreement was complete, the Court reasoned, there would have been no reason to negotiate or finalize the agreement. The Court further observed that paragraphs 1-9 in the agreement incorporated by reference other agreements, all of which were couched in definitive language. Finally, the court noted that each well drilled on the Farwell acreage was subject to operating agreements carrying a non-consent penalty of 350% of the costsindicating that the forfeiture penalty was a preliminary idea, and had not been carried into effect in any of the subsequent operating agreements.
The sole issue in this case is what effect ought to be given to the preliminary agreement contained in paragraph 10 of the Tomlinson-BTA agreement. We agree with the trial court that Martin had notice of this agreement, as it was specifically included by reference in the assignment from Tomlinson to Martin. The problem, of course, is: of what sort of agreement did Martin have notice?
The word preliminary, by itself, does not necessarily connote a tenative or non-binding agreement. Preliminary, in its most general usage, implies something which precedes something else. Webster's New Collegiate Dictionary, 1970. Use of the term `preliminary' to describe the agreement between Chevron and Tomlinson therefore suggests that other agreements were expected to follow this initial agreement. It does not preclude the agreement from being final until later agreements are reached, or from being the only agreement in the event no other agreements are confected.
More difficult, however, is the additional language at the conclusion of paragraph 10, which makes reference to negotiations and finalization of the preliminary agreement. Martin argues that this sentence evidences an intent that a written agreement was contemplated which would include the terms listed in the preliminary agreement. No written agreement was ever made subsequent to this assignment to BTA which included the same non-consent penalty provision. Instead, the written operating agreements for the wells drilled on the Farwell lease all adopted the less onerous 350% penalty provision common in the oil industry. Therefore, Martin argues, the preliminary agreement did not bind BTA, nor Martin itself through reference in the assignment from Tomlinson.
Although Martin's argument is forceful, we find that the trial court's resolution of the problem most truly reflects the intent of the parties. Clearly, the rather unfortunate description of the agreement between Chevron and Tomlinson in the BTA assignment is susceptible of more than one interpretation. Under the civil code, courts are bound to give effect to contracts according to the true intent of the parties. La.C.C. art. 1945. To ascertain the intent behind the agreement, then, it is necessary to understand the position of the respective parties before, during and after the execution of the agreement in question.
At the outset, an agreement to acquire a lease was reached between Chevron and Tomlinson through the exchange of Telexes. Part of this Telex agreement, which constituted a binding contract between Chevron and Tomlinson, provided for a non-consent penalty of forfeiture of acreage. Aware of his responsibility under this contract, Tomlinson attempted to incorporate the loss of acreage provision: first, in his assignment to BTA, and then later, in his assignment to Martin. The intent to bind BTA to the agreement between Chevron and Tomlinson is evident from the statement that BTA "shall be a party to the written agreement with Chevron finalizing the points listed above." Although it is possible that a future written agreement was contemplated, it is more probable that the written agreement was the Telex agreement between Chevron and Tomlinson.
*473 When Chevron and Tomlinson first agreed to purchase the Farwell lease, they recognized the high risk nature of the enterprise and no doubt agreed to the loss of acreage penalty as a means of insuring that each party would remain to provide its respective drilling costs. Once the parties were bound by the more onerous agreement, there would be little difficulty in reaching agreement on individual operating agreements where the penalty for non-consent was the more traditional loss of 350% of costs.
For Martin, several options existed at the time Chevron, as operator, began drilling. Martin could have joined the operating agreements and paid its share of the costs along with the other interest owners. Apparently, Martin did not wish to or could not pay the costs at the time. Alternatively, Martin could have joined the operating agreements and reneged on payment of costs, in which case he would have been subject to the 350% penalty. Martin did not do this, however, but attempted to avoid a penalty altogether by construing Tomlinson's assignment to BTA so that no preliminary agreement bound Martin, and allowed Martin a 7% interest in production after costs, with no initial investment or risk. In so doing, Martin forfeited his interest in the unit acreage of the four wells drilled under the lease.
In summation, we find that the preliminary agreement described in the Tomlinson-BTA assignment was not an agreement to agree, but an actual contract between Chevron and Tomlinson, which subsequently bound Tomlinson's assignees, BTA, Cotton and Martin, who received their assignments with notice of this prior agreement.

DECREE
For the foregoing reasons, the opinion of the Court of Appeal is reversed, and the judgment of the trial court reinstated.
REVERSED.