IN THE UNITED STATES COURT OF APPEALS

FOR THE FIFTH CIRCUIT

---

No. 92-3832

---

NEWPORT LIMITED, a Partnership
in Commendam,

Plaintiff-Appellant,

versus

SEARS, ROEBUCK & COMPANY,

Defendant-Appellee.

---

Appeal from the United States District Court
for the Eastern District of Louisiana

---

(October 29, 1993)

Before KING, HIGGINBOTHAM, and DeMOSS, Circuit Judges.

HIGGINBOTHAM, Circuit Judge:

This case appears before the Fifth Circuit for the second time. In 1990, the district court granted summary judgment for Sears, Roebuck and Co., on Newport Limited's civil RICO claim and dismissed Newport's pendent state law claims. We affirmed the RICO decision, but instructed the trial court to rule on the pendent claims given the advanced state of the litigation. On remand, the court granted summary judgment on Newport's state law claims as well. We REVERSE the district court order granting summary judgment and REMAND for further proceedings.

As Newport appeals from summary judgment, we view the evidence in the light most favorable to Newport. Barrett Computer Services, Inc. v. PDA, Inc., 884 F.2d 214, 216 (5th Cir. 1989).

Newport owns approximately 700 acres at the intersection of the Mississippi River-Gulf Outlet and the Gulf Intracoastal Waterway in Orleans Parish. In the early 1980's, Newport began efforts to develop the property into an industrial park. In May 1983, Sears' subsidiary Coldwell Banker contacted Newport to discuss locating an import distribution facility at the site. Sears had several warehouse and distribution centers scattered around New Orleans, and was interested in consolidating them if that would result in savings.

Upon Sears' suggestion, Newport retained Goldman, Sachs & Co. to assist in preparing its proposal. On September 22, 1982, Newport presented a package outlining plans for the proposed distribution center. The proposal's price and terms were based upon the outlined specifications, but Newport invited "Sears [to] make whatever changes to the existing design it considers desirable. If the design changes result in cost differences . . . the lease rates will be adjusted accordingly." The proposal specified that the lease rates would be adjusted according to a formula devised by Goldman Sachs and previously used for a Sears facility in Texas.

In December 1983, Sears officials met with Newport to examine the proposal. A member of Sears' site selection committee stated

that Sears had determined that an import distribution center was feasible and should be located in New Orleans. A Sears financial analyst acknowledged the Goldman Sachs formula and noted that Sears could calculate the rent during development by entering construction costs into the formula.

Sears then requested design changes. In February 1984, Newport submitted a revised proposal incorporating those changes. Newport calculated the rent to be $2.26 per square foot per year. Upon receiving the revisions, Sears reviewed the rent calculations and discovered that Newport had made an error. According to the formula, Sears confirmed that the correct rent for the revised proposal would be $2.48 per square foot per year.

Sears' interest in the Newport site depended upon its designation as a Foreign Trade Zone. Sears also insisted upon infrastructure improvements including better road access. Newport sought these prerequisites from the necessary governmental agencies. By March 1984, Newport found that its negotiations with government agencies could not proceed without a commitment from Sears. On March 15, 1984, representatives of Sears and Newport met to review the proposal. Newport informed Sears that a firm commitment was necessary to accomplish the desired improvements and to establish trade zone status. Recognizing this need, Sears decided to review the project thoroughly and make a final decision.

By August 1984, Sears completed a detailed study of the project. This study recommended locating a 650,000 square foot import distribution center at Newport's site. A separate Sears'

3

review had previously concluded that the annual rent for the equivalent warehouse space, scattered about New Orleans, would total $3.92 per square foot. The review included Newport's proposed $2.48 rent and noted that foreseeable construction cost escalations of $1 million would increase the rent to $2.73. The review estimated that a consolidated center in a foreign trade zone at Newport's industrial park would produce an annual savings of over a million dollars.

Sears executives approved the 25-year lease of a 650,000 square foot facility to consolidate New Orleans import distribution operations. On October 16, 1984, Sears informed Newport of approval to construct the facility at Newport's site. Sears' personnel were to define the plans and specifications. Soon after, Sears formally advised the City of New Orleans of its decision to locate at Newport. The City then publicized this decision.

In November 1984, Sears informed Newport that new specifications, upgrading the proposed building, were forthcoming. Relying upon Sears' good faith and the announced decision, Newport commenced development. It retained consultants and initiated detailed discussions with City, State, and Federal agencies, to gain approval for the trade zone status and infrastructure improvements Sears requested.

As part of these efforts, Newport pursued an Urban Development Action Grant from the United States Department of Housing and Urban Development. This Grant would subsidize the City's infrastructure improvements. To assist in obtaining the Grant, Newport requested

4

evidence of Sears' commitment. On November 30, 1984, Sears' territorial real estate manager wrote a letter expressing Sears' intention to enter into a build-to-suit transaction with Newport. This letter had been reviewed and revised by Charles Houk, an in-house attorney working on the transaction for Sears.

The November 30 letter did not satisfy HUD officials because it left uncertain Sears' commitment to carry out the project. Newport requested written evidence of Sears' firm commitment. Newport informed Sears' counsel Houk that the necessary document must demonstrate actual commitment by Sears to the Newport project. Newport sent Sears a proposed agreement, with a cover letter stating that it duplicated the November 30 letter of intent "with the additional items required by HUD."

On January 4, 1985, representatives of Newport and Sears again conferred regarding the draft document sent by Newport. They negotiated and revised its provisions. In particular, they discussed its reference to rent. Newport's representative believed that both parties understood that this provision implicitly required use of the Goldman Sachs formula. Thus, although the draft allowed Sears to propose design changes that would increase construction costs, the rent adjustment referred to in the draft could be calculated. At the end of this discussion, Sears' representative stated that he would review the document and present it to Sears' officials for approval. Ron Stafford and A.H. (Art) Ruff of Sears reviewed the document and Ruff executed it on January

9, 1985. Newport accepted the terms of the agreement the following day.

On January 24, 1985, Sears' counsel spoke to a HUD official and confirmed Sears' agreement to proceed with the project. Sears' counsel told the official that no other corporate approval for the project was required and that Sears would proceed under the terms of the January 9, 1985 document. Stafford also later testified that after January 9 the Newport project was a "done deal."

The January 9 document appears on Sears letterhead and reads, in pertinent part:

> We have analyzed the proposal offered by you for the construction of a new import/export warehousing facility to be located within the Newport Industrial Park, New Orleans, Louisiana, such construction to be on a build-to-suit basis. Based upon our analysis and subject to the preparation of mutually agreeable legal documentation, we are prepared to enter into the transaction on substantially the following terms and conditions.
> . . .
> 2. We have revised your proposal to provide that the facility shall initially be an approximately 650,000 square foot building with related improvements to be constructed by Newport, and is designed to accommodate additional expansion of approximately 300,000 square feet. . . .
> . . .
> 4. It is our understanding that Newport Limited is working with the City of New Orleans in its request for a HUD Urban Development Action Grant in the amount of $8,000,000 to fund the public infrastructure described in item 3 above. Our commitment to this transaction is contingent upon the said infrastructure being provided.
> 5. The initial lease term shall be 25 years with the lease containing six five-year renewal options.
> . . .
> 7. During the initial term of the lease, the annual rent per square foot will be $2.48, to be adjusted to reflect the value engineering currently in progress, Tenant changes and increases due to inflation factors.
> . . .
> It is to be understood that the matters contained in this letter will form the basis of a much more detailed document, the terms and conditions of which are subject to the mutual

agreement of the parties.  It is therefore not intended to be a comprehensive statement of our respective rights, duties and obligations which will be fully set forth in said document.
. . .
     The undersigned has the authority to execute this letter agreement with Newport Limited.

                         /s/ A.H. Ruff
                         Regional Real Estate Manager

Sears executed this document, which provides that the rent figure of $2.48 per square foot was to be adjusted.  In deposition, four Sears officials--Ruff, Reaves, Hosch, and Tidmarsh--testified that Sears never intended to pay more than $2.48 as a final rent. Sears did not inform Newport of this intention.

After the January 9 agreement, Newport continued developing the project.  Actual construction could not begin, however, until Sears provided more specifications.  On June 20, 1985, the parties met to discuss these matters.  Sears agreed to provide building plans and specifications within two weeks of the June 20 meeting. The bid package was to be completed by September.  In fact, Sears never delivered the necessary information.

Eleven days later, on July 1, 1985, Charles Reaves became Sears' Vice President of Distribution.  Reaves was chairman of a task force studying Sears' distribution system.  By the summer of 1985, Reaves concluded that Sears had excess warehouse and distribution space--without the Newport facility.  Sears therefore decided that it neither needed nor wanted to lease more space at Newport.  Subsequently, the company issued a moratorium on all major warehouses.

7

On September 16, 1985, Reaves and other Sears officials met to develop a strategy regarding Newport. After the meeting, on September 18, Ruff circulated a memorandum summarizing the options that had been considered. According to Ruff, these were (1) candidly advise Newport that Sears would not proceed and desired to cancel the project; (2) proceed with the project to avoid legal consequences and protect Sears' credibility; (3) proceed but take "an extremely hard nosed position" in negotiations with the acknowledged possibility that such an approach might cause Newport to abandon the project; and (4) request to stay the project for several months pending reconsideration by Sears of whether to proceed, downsize, or cancel the project. Ruff stated that the consensus of the September 16 meeting was to recommend the fourth option to senior management.

Six months later, Newport requested design information from Sears and suggested a schedule for the construction. On March 14, 1986, Ruff circulated a memorandum discussing this schedule. It began by stating, "The officers of the company have decided to proceed with the leasing and development of the 650,000 square foot IDC in New Orleans with Newport Enterprises." On a copy of this memorandum, Vice President Dan Reaves added the handwritten notation, "there is no way we could work with these dates and even if we could we would still stay with our original plan, i.e. 'drag our feet'!"

After the September 1985 Sears meeting, Sears had ceased providing information to the Newport project developers. Sears'

supervisor of construction planning was informed that the project was discontinued. Other Sears employees referred internally to the project being on hold.

At meetings in October and November 1985, Sears requested that Newport agree to a six month delay so that Sears could complete a study of its distribution practices. Newport examined the impact of this request, particularly upon the HUD Grant. On December 4, 1985, Sears officials including Reaves, Ruff, and Houk met with Newport personnel. Newport informed Sears that the requested delay would endanger the Grant, and so Newport refused. A Sears official suggested that the project be reduced in size. Newport declined, citing the January 1985 agreement to 650,000 square feet and noting that a reduction would also jeopardize the Grant. Finally, Ron Ruth stated that Sears would honor its commitments.

At this time, Newport proposed a bid package for one design of the facility. Sears agreed to review the proposal and provide suggestions or approve it or both. Sears did not do so.

In January 1986, Sears requested that Newport respond in writing to a proposal to downsize the facility. On January 15, 1986, Newport declined this proposal. Newport noted that the HUD Grant had been awarded on the basis of the original proposal, and would be jeopardized by a reduction. Other government agencies had made plans and commitments based on the original size as well.

In February 1986, Ruff wrote a letter for Sears confirming that Sears' officers had decided "to move forward with the leasing of the 650,000 square foot facility." This letter stated that the

rent was "not to exceed $2.48 a square foot." When a Newport employee called to discuss rent, Sears stated that $2.48 was "non-negotiable."

Meanwhile, Sears had advised Newport that it would make design changes, but did not respond to Newport's proposed bid package. Changes proposed by Sears might have increased construction costs.

In March 1986, Sears delivered a draft lease to Newport. Like the February letter, the draft lease set the "non-negotiable" annual rent at $2.48 per square foot. The draft lease also allowed Sears to make changes to the building prior to construction, without affecting the rent. Finally, contrary to previous negotiations, the lease provided that Newport would pay for insurance on the facility.

II

Newport sued Sears in June 1986 alleging breach of contract, civil RICO, and deceptive trade practices. In 1990, the district court dismissed the RICO claims on the merits and dismissed the pendent state law claims without prejudice. Newport Ltd. v. Sears, Roebuck & Co., 739 F. Supp. 1078 (E.D. La. 1990). Newport appealed, and we affirmed the dismissal of the RICO claim but vacated the dismissal of the pendent claims. Newport Ltd. v. Sears, Roebuck & Co., 941 F.2d 302 (5th Cir. 1991). On remand, Sears once more sought summary judgment on the state law claims, which the district court granted. Newport again appeals.

III

A

We review the district court's grant of summary judgment de novo, applying the same standard as the district court. Hanks v. Transcontinental Gas Pipe Line Corp., 953 F.2d 996, 997 (5th Cir. 1992). Summary judgment is proper only if the record discloses that there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. Harbor Ins. Co. v. Trammell Crow Co., 854 F.2d 94, 98 (5th Cir. 1988) (quoting Fed. R. Civ. P. 56(c)), cert. denied, 489 U.S. 1054 (1989). We indulge every reasonable inference from the facts in favor of the non-movant. Powers v. Nassau Development Corp., 753 F.2d 457, 462 (5th Cir. 1985).

B

Before reaching the merits, we must determine which documents in the record should be considered. Specifically, Sears has moved to strike Newport's references to three documents prepared by Houk, an in-house attorney at Sears. We have carried that motion with the case.

On May 18, 1990, the district court entered an order holding that these documents were subject to the attorney-client privilege. That order, in effect, struck them from the record. In the prior appeal, this court affirmed that order. Newport Ltd. v. Sears, Roebuck & Co., 941 F.2d 302, 308 n.10 (5th Cir. 1991). Our decision, however, noted that the district court's evidentiary ruling may have been influenced by its contemporaneous dismissal of the action, which this court vacated. Our opinion stated that "the

11

district court is free to revisit that issue, should it choose to do so, as it may apply to the state-law claims" that we reinstated. Id.

Newport does not contend that the district court reconsidered its ruling on this issue. Nor did Newport request reconsideration. It explains this omission by referring to the district court's order on remand that "pre-trial motions shall not be filed without leave of it." This does not explain, however, why Newport did not seek leave to move for reconsideration. Moreover, Newport's responses to Sears' motion for summary judgment did not request consideration of these documents--indeed, Newport did not mention the documents. Nonetheless, Newport refers to these documents in its briefs to this court. It contends that they remained part of the record that we may consider, or that we may rule on their admissibility ourselves.

We conclude that we are unable to consider these documents in our determination. Privileged documents are inadmissible and thus may not defeat summary judgment. See Howell Hydrocarbons, Inc. v. Adams, 897 F.2d 183, 192 (5th Cir. 1990). Newport did not seek reconsideration of the district court's evidentiary decision and the court did not choose to revisit the issue sua sponte. Having once affirmed the district court's ruling, we will not revisit the issue where the district court has not done so.[1]

---

[1]Sears' request for sanctions against Newport is denied. Given our remand on the merits, we once more note that the district court may revisit the issue, if it so chooses.

Sears' motion to strike also refers to documents prepared by Ruff, Sears' regional real estate manager. The district court held that these materials were not privileged and they remain part of the summary judgment record on appeal.

## IV

Evidence in the record supports conflicting understandings of the relationship between Newport and Sears. Giving credence to the inferences most favorable to Newport, the non-movant, we conclude that Sears is not entitled to judgment as a matter of law regarding any of Newport's claims.

### A.

#### 1.

Newport maintains that a binding agreement came into effect when both parties executed the letter dated January 9, 1985. The developer argues that Sears intended to commit to the project and agreed on all its essential terms. Sears denies that the letter was meant as an enforceable agreement; it claims to have executed the letter only to facilitate the HUD grant. To support its position, Sears points to language referring to terms and conditions to be agreed upon in the future.

Although there is little authority, Louisiana law appears to recognize the enforceability of preliminary agreements.

> The settled jurisprudence of this State is that an agreement between parties, where their minds have met upon all essentials, constitutes a contract between them and binds them at once although they may have agreed that they would thereafter execute a formal instrument containing the terms of their present agreement.

13

<u>Mermelstein v. Schwab</u>, 64 So. 2d 37, 38 (La. Ct. App. 1953) (citations omitted). A so-called preliminary agreement may be binding, even though it refers to a future written agreement finalizing its contents. <u>Chevron U.S.A., Inc. v. Martin Exploration Co.</u>, 447 So. 2d 469 (La. 1984). In <u>Martin Exploration</u>, the Louisiana Supreme Court noted that use of the word preliminary "does not preclude the agreement from being final until later agreements are reached, or from being the only agreement in the event no other agreements are confected." <u>Id.</u> at 472. Moreover, the court found that the reference to a document "finalizing the points listed above" did not evince an intent to be bound only upon the execution of a later instrument. <u>Id.</u> Nor did an allusion to future "negotiations" render the preliminary agreement non-binding. To the contrary, the Supreme Court of Louisiana held that the document was binding as that interpretation most accurately reflected the intentions of the parties. <u>Id.</u>

Thus, whether a binding obligation existed upon the execution of the letter of intent of January 9, 1985, or only upon the execution of a later, more comprehensive document, depends upon the intentions of the parties. <u>Courtin v. Sharp</u>, 280 F.2d 345, 349 (5th Cir. 1960), <u>cert. denied</u>, 365 U.S. 814 (1961) (citing <u>Mermelstein</u>); <u>cf.</u> La. Civ. Code Art. 1947 (West 1987) (certain form of contract execution required if contemplated by the parties). The parties' intent is a question of fact. <u>See</u> <u>Trinity Carton Co. v. Falstaff Brewing Corp.</u>, 767 F.2d 184, 190 (5th Cir. 1985), <u>cert. denied</u>, 475 U.S. 1017 (1986); <u>see also</u> <u>Texaco, Inc. v. Pennzoil</u>,

14

Co., 729 S.W.2d 768, 788 (Tex. App.--Houston [1st Dist.] 1987, writ ref'd n.r.e.) (New York law), writ ref'd n.r.e., cert. dismissed, 485 U.S. 994 (1988).

Newport argues that a reasonable person, examining the summary judgment evidence, could find that Sears and Newport intended to be bound by the January 9, 1985 letter agreement. We agree. There is ample evidence to support this conclusion.

The Supreme Court in Martin Exploration considered the actions of the parties taken subsequent to the agreement in dispute as a basis for inferring the parties' intentions. Martin Exploration, 447 So.2d at 472. That approach proves useful in the present case. Sears' actions subsequent to the letter of intent indicate that it considered itself bound. In particular, when Sears officials became uncertain as to the need for the warehouse which Newport would provide, they requested to stay the project. The two parties characterize Sears' actions differently. Newport claims that Sears attempted to frustrate Newport's efforts to implement the agreement and that Sears therefore acted in bad faith. Sears responds that it intended to complete the transaction but disagreed with Newport on some of the terms. The claims of the two parties support the same conclusion, that is, that Sears considered the agreement binding. If Sears were not bound, it would not have required Newport's permission to suspend the project.

The letter of January 9, 1985 offers some basis for concluding that Sears bound itself to the project. Thus, for example, Sears designated the document a "letter agreement" and expressed an

15

intent "to enter into the transaction on substantially the... terms and conditions" contained in the letter. This language indicates that the parties had settled on the essential terms of the transaction. Other aspects of the letter, however, are more ambiguous. The qualification that the letter was not a "comprehensive statement of [the parties'] rights, duties and obligations" is representative in this regard. That claim suggests, on the one hand, that the parties had established in the letter certain rights, obligations and duties but, on the other hand, that other such terms would follow. It leaves unclear whether any of the essential elements of the deal had yet to be resolved.

Other evidence is probative of Sears's intent in signing the letter. Thus, for example, after Newport signed the letter, Sears officials stated that the deal was consummated. We need not conclude with certainty, however, that Sears intended that the letter serve as a contract. We hold only that based on the record, a reasonable jury could reach that conclusion.

2.

Sears maintains that, regardless of intent, the January 9, 1985 letter is legally insufficient as a lease instrument. Under Louisiana law, the confection of a lease obligation must meet three requirements. It must indicate: the object of agreement, its price, and the parties' consent. Trinity Carton, 767 F.2d at 190 (citations omitted). See also La. Civ. Code art 2670 (West 1993).

16

Sears first notes that the letter of January 9, 1985 is unclear about the amount of rent to be paid. It provides for annual rent of $2.48 per square foot "to be adjusted." Sears could make design changes, giving it control over one adjustment factor. Sears relies on Louisiana state law suggesting that, for a lease to be valid, the factors that determine rent must not be within the control of the parties. See, e.g., Sealy (Pines Rd.) v. Physicians & Surgeons Hosp., Inc., 480 So.2d 832, 837 (La. App. 2 Cir. 1985), writ denied, 483 So.2d 1024 (La. 1986) (finding rent determinable where it was implicitly renewed at a rate agreed upon in the past because it was "beyond control of the parties"). The law merely requires, however, that the parties have completed negotiating the amount of the rent, although the parties' decisions or actions may influence the rent owed. See, e.g., Mouton v. P.A.B., Inc., 450 So.2d 410, 412 (La. App. 3 Cir. 1984), write denied, 458 So.2d 118 (La. 1984) (rent made contingent on profit's earned by lessee, over which lessee had control, was nevertheless determinable). Newport offers evidence that the Goldman Sachs formula would govern the adjustments made to the rent. Indeed, at one point, Sears relied on the formula to correct an error that Newport had made in a provisional calculation of the rent. Testimony suggests that the formula would reflect any changes Sears might require. Thus, if a jury were to accept that the contract incorporates the Goldman Sachs formula, the rent is determinable.

Sears also claims that the premises were not adequately defined to support a lease. In response, Newport points to the

17

letter's description of a 650,000 square foot facility and improvements to be made at the site to establish that the lease was sufficiently determinate. The Supreme Court of Louisiana has held that, where the plans and specifications of premises to be leased have yet to be negotiated, no enforceable lease exists. Sig Hass & Son v. Bernhardt, 81 So. 402, 403 (La. 1919) (finding an oral lease unenforceable where its terms were insufficiently definite). In reaching that conclusion, however, the court indicated that had the unresolved aspects of the lease lay within the control of one of the parties, the lease might have been enforceable. Id. ("Plaintiffs do not allege that they alone were to decide upon the plans and specifications... "). See also Arata v. Louisiana Stadium and Exposition District, 225 So.2d 362, 366-67 (La. 1969), cert. denied, 396 U.S. 279 (1970) (finding a sufficiently defined "thing" where the site of a stadium was subject to possible change upon mutual agreement). Newport claims that Sears reserved the right to change the specifications and plans for the storage facility and that the Goldman Sachs formula for determining the rent would reflect the cost of such changes. If the jury were to accept this contention, it could find that a sufficiently determinate lease existed to bind the parties. We are not prepared to deny the jury that opportunity.

3.

Sears invokes the doctrine of error, arguing that any consent it gave in January 1985 was ineffective because Newport misled it. Under the Louisiana Civil Code, a party is not bound by a contract

18

which it entered as a result of error, fraud or duress.  La. Civ. Code art. 1948 (West 1993).  More precisely, if a party would not have entered a contract had it not held a mistaken belief, and the other party was or should have been aware of this mistake, the party is not bound by that contract.  La Civ. Code art. 1949 (West 1993).  Sears' reliance on this doctrine is misplaced.

Sears maintains that its reason for signing the letter was to allow Newport to secure a grant.  Newport claims that Sears committed itself to the transaction through the letter.  These two views are not inconsistent.  In order for Newport to secure a HUD grant, it needed a statement from Sears indicating Sears' commitment to the project.  That Sears bound itself when it did, if it did, in order to enable Newport to pursue the grant does not preclude the possibility that the letter constituted a contract.  Sears wanted Newport to build a warehouse.  Newport desired Sears as its primary tenant.  Thus, Sears and Newport had complementary interests which could serve as the basis for a contract.  That the desire to secure a grant prompted the formation of the contract would not make it any less binding.  A reasonable jury could find that a contract existed.

## B.

Newport claims that Sears committed fraud on several occasions.  It pursues these claims under Louisiana Civil Code articles 1953 and 2315.

19

1.

To recover under article 1953, Newport must demonstrate the existence of a contract.  See Pedalino v. Pitre, 431 So.2d 20, 21 (La. App. 1 Cir. 1983) (Article 1953 pertains only to parties to a contract); State Farm Fire & Casualty Co. v. Williams, 453 So.2d 309, 311 (La. App. 1 Cir. 1984) (same).  Assuming Newport meets this burden, it must then show, first, that Sears misrepresented or suppressed the truth with the intention of either gaining an unjust advantage or causing Newport to suffer a loss and, second, that this misrepresentation or suppression of the truth caused actual or probable damages to Newport.  Dutton & Vaughan, Inc. v. Spurney, 600 So.2d 693, 698 (La. App. 4 Cir.), writ denied, 601 So.2d 663 (La. 1992).  Newport predicates its claim under article 1953 on the letter Sears executed in January 1985.  Assuming, without deciding, that the letter constituted a contract, we find that Newport has raised a genuine issue of material fact as to whether Sears intentionally misled Newport in order to gain a strategic advantage.

In the letter of January 1985, Sears stated that it would pay rent at an annual rate of $2.48 per square foot to be adjusted to reflect, among other considerations, "the value [of] engineering" in progress at the time.  In an internal review in 1984, Sears noted that the then prospective engineering could increase the monthly rent by as much 10%, up to $2.73.  Several Sears officers testified, however, that Sears never intended to pay more than $2.48 per square foot per year for the leased space.  Newport

20

claims that this contradiction supports the inference that the January 1985 letter was deliberately misleading. Sears hoped, according to Newport, to effect engineering changes only later to refuse to accept any increase in the cost of rent. Newport's investment in reliance on the letter would by then have placed Sears in an advantageous bargaining position.

Newport's evidence supports its contention that Sears took deliberately misleading actions in order to secure a bargaining advantage. If the lease incorporates the Goldman Sachs formula, as it must to be sufficiently definite, Sears' proposed changes could have increased the rent to more than $2.48. Sears' apparent intent from the outset to refuse to pay the augmented amount is curious. Moreover, Sears' officers decided to adopt a deliberately "hard nosed position" in forcing Newport to choose between accepting the $2.48 in rent or abandoning the project. Thus, Sears gained a tactical advantage from Newport's reliance on Sears' commitment, if Sears in fact made one, to abide by the Goldman Sachs formula. Sears' claim that it never believed that it had committed itself is plausible. Nevertheless, the inference is fair that Sears anticipated and even intended the benefit it received by misleading Newport. We therefore find that Newport has raised a genuine issue of material fact as to its first allegation of fraud.

### 2.

Newport also proceeds on a charge of delictual fraud pursuant to Civil Code article 2315. The elements of this cause of action are: "(1) a misrepresentation of a material fact, (2) made with

21

the intent to deceive, and (3) causing justifiable reliance with resultant injury." Abell v. Potomac Ins. Co., 858 F.2d 1104, 1131 n.33 (5th Cir. 1988) vacated on other grounds, 492 U.S. 914, 109 S.Ct. 3236 (1989) (citing La.Civ.Code arts. 1847, 2315; Silver v. Nelson, 610 F.supp. 505, 521 (E.D.La. 1985)). To recover under article 2315, Newport need not prove the existence of a contract. Id. (citing Restatement (Second) of Torts as referred to in Dousson v. South Cent. Bell, 429 So.2d 466, 468 (La. App. 4th Cir.), writ not considered, 437 So.2d 1135 (La. 1983)). Newport bases this cause of action on several statements by officers of Sears that it wished to continue development of the warehouse. These statements persisted after a meeting in which Sears officers considered several possible courses of action. A memorandum that one of the officers circulated after the meeting summarized these options. They included: (1) candidly informing Newport that Sears would not proceed with the project; (2) proceeding with the project to avoid legal consequences and to protect Sears' credibility; (3) proceeding but taking "an extremely hard nosed position" with the acknowledged possibility that Newport might abandon the project; and (4) requesting to stay the project pending reconsideration of whether to proceed with, downsize, or cancel the project. One of the officers, Ruff, later circulated a memorandum expressing a general agreement to proceed under option four. Six months later, however, when Newport submitted a request for design specifications and suggested a schedule to begin construction, Vice President Dan Reaves wrote on his copy of a memorandum discussing the request

22

that "there is no way we could work with [Newport's proposed schedule] and even if we could we would still stay with our original plan, i.e. 'drag our feet'!" Sears never submitted to Newport the requested specifications.

This evidence, and evidence indicating that Sears did not wish to proceed with the warehouse, together suggest that Sears deliberately misled Newport as to its intentions. Sears' allegedly refused to acknowledge its desire to abort the project in the hope that Newport would despair of its completion. As Sears' memorandum indicates, if Sears forthrightly abandoned the project Newport would likely take legal action, whereas a successful effort at stalling might leave Newport with the impression that the endeavor simply failed. This, at any rate, is Newport's argument. Sears' claim that it negotiated in good faith is plausible. A reasonable jury could find, however, that Sears misrepresented its intentions in order to avoid liability. As Newport has raised this genuine issue of material fact, we reverse the district court's grant of summary judgment to Sears.

C.

Newport also seeks recovery under Louisiana Civil Code article 1967, which provides in pertinent part:

> A party may be obligated by a promise when he knew or should have known that the promise would induce the other party to rely on it to his detriment and the other party was reasonable in so relying. Recovery may be limited to expenses incurred or the damages suffered as a result of the promisee's reliance on the promise. Reliance on a gratuitous promise made without required formalities is not reasonable.

23

To recover under article 1967, Newport must establish that Sears made a promise on which Newport relied justifiably and to its detriment. See Breaux v. Schlumberger Offshore Services, 817 F.2d 1226, 1229 (5th Cir. 1987); South Central Bell Telephone Co. v. Rouse Co., 590 So.2d 801, 804 (La. App. 4 Cir. 1991). Newport need not prove the existence of a contract to establish its claim of detrimental reliance, even in a context where a contract would normally govern. See Morris v. People's Bank & Trust Co., 580 So.2d 1029, 1036 (La.App. 3 Cir.), writ denied, 588 So.2d 101, 102 (La. 1991) (allowing a plaintiff to proceed to trial under detrimental reliance) and Morris v. People's Bank & Trust Co., 580 So.2d 1037, 1043 (La.App. 3 Cir. 1991) (holding that the statute of frauds barred the plaintiff from pursuing the same claim in contract).

Newport predicates this claim on various of Sears' statements. The most notable of these include two letters of intent, the second arguably constituting a contract, that Sears sent Newport in November 1984 and January 1985. Sears expressed in the first letter its "intention to enter into [the] transaction" and stated in its second letter that it was "prepared to enter into the transaction." Both letters contained the essential terms under which Sears would lease a warehouse from Newport. Moreover, officers of Sears later acknowledged a commitment, both by recognizing in internal memoranda, as one officer expressed the matter, that "Sears ha[d] a moral obligation and possibly a legal obligation either to proceed or to reimburse the developer's

24

costs," and, later, by requesting that Newport allow Sears to stay the project for a period of several months. If Newport had no reasonable basis for believing that Sears had committed itself to the project, Sears would not have needed Newport's permission for this delay.

In Breaux, this court upheld a plaintiff's recovery under detrimental reliance on a claim similar in nature to Newport's. Breaux, 817 F.2d at 1230. The parties in Breaux had agreed on the terms under which the defendant would lease the plaintiff's office space. In contrast to the present case, the agent for the defendant who arranged the transaction had stated clearly that commitment would have to await the approval of his superior. Nevertheless, on the basis of a letter from the agent expressing the defendant's "intention to enter a rental agreement," the plaintiff ceased making any other efforts to let the space. Subsequently, when the market changed, the defendant decided not to abide by the original terms of the transaction. Id. at 1228-29. This court affirmed the district court's order allowing the plaintiff to recover for rent lost in reliance on the defendant's stated commitment. Id. at 1233.

Sears sent Newport its letter in January 1985 for the specific purpose of confirming its commitment to the transaction. Sears subsequently acknowledged the possible moral and legal obligations it had incurred as a result of the actions that Newport had taken. A jury could find that Newport had expended considerable time and effort, and had foregone other lucrative possibilities, in

25

reasonable reliance on the commitment Sears expressed to lease the warehouse space.

### D. Damages

Finally, to recover under any cause of action, Newport must establish the damages it suffered as a result of Sears's actions. To defeat summary judgment, Newport must raise a genuine issue of material fact in regard to the damages it claims. Toward this end, Newport offers the testimony of its expert witness.

Newport's offer of summary judgment evidence in support of its claims for damages is admittedly thin. Ordinarily, it is the province of the jury to gauge the credibility of an expert witness and the reliability of the expert's data. See Dixon v. International Harvester Co., 754 F.2d 573, 580 (5th Cir. 1985) (citing Grenada Steel Industries v. Alabama Oxygen Co., 695 F.2d 883, 889 (5th Cir. 1983)). In particular, Newport offered an expert's statement as to the amount of damages it suffered in out-of-pocket costs, lost public monies, and lost profits. Moreover, in Newport's submissions to the court, Newport appended the calculations upon which the estimate of lost profits was based. Without now deciding on the appropriateness of compensating Newport for these categories of damages, we hold that Newport's evidence, which Sears failed to rebut, raised a genuine issue of material fact.

### Conclusion

Newport has raised genuine issues of material fact on its claims for breach of contract, fraud and detrimental reliance. As

26

a result, we REVERSE the decision of the district court and REMAND for further proceedings.