IN THE UNITED STATES COURT OF APPEALS

FOR THE FIFTH CIRCUIT

_____

No. 98-31366
Summary Calendar
_____

TONY B JOBE, Individually and as Assignee of
Air New Orleans, Inc,

                              Plaintiff-Appellant,

v.

ATR MARKETING, INC; AEROSPATIALE, S.N.I.; FINMECCANICA
S.P.A.; AVIONS DE TRANSPORT REGIONALE (GIE); AEROSPATIALE
INC,

                              Defendants-Appellees.

_____

Appeal from the United States District Court
for the Eastern District of Louisiana
(96-CV-3396-C)
_____

June 23, 1999

Before KING, Chief Judge, POLITZ and BARKSDALE, Circuit Judges.

PER CURIAM:[*]

    Plaintiff-appellant Tony B. Jobe, suing individually and as

the assignee of Air New Orleans, Inc., brought a detrimental

reliance claim against defendants-appellees ATR Marketing, Inc.,

Aerospatiale, S.N.I., Finmeccanica S.p.A., Avions de Transport

Regionale (G.I.E.), and Aerospatiale, Inc.  The district court

_____

    [*]Pursuant to 5TH CIR. R. 47.5, the court has determined that
this opinion should not be published and is not precedent except
under the limited circumstances set forth in 5TH CIR. R. 47.5.4.

granted summary judgment in favor of the defendants-appellees. After careful consideration of the pleadings, summary judgment evidence, briefs, and relevant case law, we affirm.

## I.   FACTUAL AND PROCEDURAL BACKGROUND

Plaintiff-appellant Tony B. Jobe is the former president and chief executive officer of Air New Orleans, Inc. ("Air New Orleans" or "ANO"), a bankrupt Louisiana airline.[1]  Avions de Transport Regionale (G.I.E.) ("ATR") is a French business association similar to a joint venture.  The joint venturers are Aerospatiale, S.N.I., a government-owned French aerospace corporation, and Finmeccanica, S.p.A., a somewhat analogous entity operated by the Italian government.  ATR Marketing, Inc. ("ATR Marketing") is an ATR sales subsidiary headquartered in Virginia.

Air New Orleans began operating as a regional airline in 1981.  In 1986, Air New Orleans became a Continental Airlines ("Continental") code-sharing partner, meaning that passengers could book Air New Orleans flights through Continental's computer reservations system, and a carrier for Continental Express, providing commuter service to cities in Louisiana, Mississippi, Alabama, and Florida.  In August of that year, Hugh Schmittle, a sales representative for ATR Marketing, contacted Air New Orleans to propose a meeting at which he could make a marketing

_____

[1]  Air New Orleans's trustee in bankruptcy assigned the estate's claims to Jobe.

presentation for ATR-42 aircraft.[2]  Schmittle made such a presentation several weeks later to Jobe and Gordon Long, Air New Orleans's vice-president of operations.

The result of Schmittle's efforts was a protracted series of negotiations for the purchase of ATR-42 aircraft by Air New Orleans.  In September 1986, Jobe and Long attended the Farnsborough Air Show in England and toured ATR's plant in Toulouse, France with Schmittle and Sheldon Best, ATR Marketing's chief operating officer.  Soon afterward, according to Air New Orleans, ATR made a "written commitment" to provide two aircraft at $7.6 million each, and Air New Orleans agreed to all but the "details" of the "commitment."  Later that month, Long met with Schmittle in Dayton, Ohio to discuss "what the terms of the agreement might be."  Long also traveled to ATR Marketing's Virginia headquarters, where he met with Schmittle and other ATR Marketing representatives to discuss the "fine points" of the Air New Orleans-ATR transaction.  In October 1986, Jobe and Long met again with Schmittle and other ATR Marketing representatives in Las Vegas, Nevada, and on the following November 6, Long met with Schmittle and ATR Marketing's president, Joel LeBreton, in Virginia.  Schmittle's report of the October meeting and Long's notes of the November meeting both indicate that Air New Orleans contemplated that an ATR-Air New Orleans deal would involve Continental's participation.

---

[2]  The ATR-42 aircraft is a 42- to 50-seat turboprop commuter plane in wide use throughout the United States.

Finally, on December 2, 1986, Jobe wrote to LeBreton to advise him that Air New Orleans was preparing a proposal for Continental to expand its service at the New Orleans airport and to be the "hub feeder" for Continental at Houston Intercontinental Airport. Jobe informed LeBreton that it was "absolutely necessary that we have the proposal outlined by yourself at our meeting in Las Vegas in writing, so that we can demonstrate Aerospatiale's intentions in this matter as they currently stand." At an Air New Orleans shareholders meeting four days later, Jobe informed those present that the company "[r]equire[d] ATR-42s or British Aerospace Jetstreams" and that it was "[g]etting [a] written proposal from Aerospatiale to provide [a] loan with aircraft; British Aerospace [is] trying to make [the] same type of proposal."

Soon after the shareholders' meeting, Air New Orleans received an ATR proposal for the supply of four ATR-42's. The proposal set forth, among other things, payment and financing conditions of the offer and noted that Air New Orleans had acknowledged that it was "not . . . in a position to make the down and progress payments usually required by [ATR] and would have to obtain financing covering 100% of the price of the aircraft." Because Air New Orleans's "current creditworthiness" was "not sufficient" to permit such an arrangement, ATR required that Texas Air Corporation, Continental's parent company, provide certain financial guarantees. The proposal stated that ATR's "present offer is valid until January 15, 1987" and that if Air

4

New Orleans accepted it, the parties would enter into a written agreement.  Air New Orleans did not accede to ATR's proposal by January 15, 1987.  Jobe testified in his deposition that his company was "attempting to get some of these minor points that to us, being a small carrier, were fairly major[,] refined."

Negotiations for the sale of the ATR-42's continued after January 15, 1987.  In March 1987, Best attended an Air New Orleans board meeting to address the points remaining to be resolved with reference to a sale of ATR-42's to Air New Orleans, and Long enjoyed a weekend of skiing with ATR executives, after which he wrote Schmittle, "Hopefully our relationship will someday result in the acquisition of ATR-42's for Air New Orleans."  In June 1987, Jobe traveled to the Paris Air Show, where he met with Best, Schmittle, and Neal Meehan, the president of Continental's commuter division, to discuss the guarantees that ATR's December 1986 proposal required.  Jobe testified at his deposition that his meeting with Meehan left him somewhat "pessimistic" because Meehan had not given him "a more firm agreement" enabling Air New Orleans to "go ahead and get the ATR aircraft."  In July 1987, following the Paris negotiations, Jobe notified Air New Orleans employees that he had begun negotiating with Beech for the lease of more C-99 aircraft and with Fairchild for the acquisition of several larger aircraft.  No mention was made of ATR-42's.  Later that same month, Jobe submitted a second proposal to Continental stating that Air New Orleans planned to operate an expanded commuter service "with Beech C-99 and

Fairchild Metro III aircraft, and is currently negotiating the terms and conditions of acquisition with Fairchild." Once again, he did not mention ATR or its planes.

On July 31, 1987, ATR and Texas Air Corporation entered into an agreement for the sale of sixteen ATR-42's, with an option to purchase an additional thirty-four aircraft. Jobe continued discussions with Best regarding a potential acquisition of ATR aircraft through August or September 1987, but, in January 1988, Air New Orleans declared bankruptcy without ever having acquired a single ATR-42.

In October 1996, Jobe filed a diversity suit against the defendants in the United States District Court for the Eastern District of Louisiana. He brought six claims: breach of contract, detrimental reliance, breach of a nondisclosure agreement, breach of fiduciary duty, solidary liability, and unjust enrichment. After both sides had taken extensive discovery, the defendants moved for summary judgment on all claims, which the district court granted. Jobe appeals only the district court's grant of summary judgment on his detrimental reliance claim.

## II. STANDARD OF REVIEW

We review a district court's grant of summary judgment de novo, applying the same standards as the district court. See United States v. Johnson, 160 F.3d 1061, 1063 (5th Cir. 1998). After consulting applicable law in order to ascertain the material factual issues, we consider the evidence bearing on

those issues, viewing the facts and the inferences to be drawn therefrom in the light most favorable to the non-movant.  See Doe v. Dallas Indep. Sch. Dist, 153 F.3d 211, 214-15 (5th Cir. 1998).  Summary judgment is properly granted if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."  FED. R. CIV. P. 56(c).

The moving party may demonstrate the absence of a genuine issue of material fact by pointing out the lack of evidence to support the non-moving party's case.  See Duffy v. Leading Edge Prods., Inc., 44 F.3d 308, 312 (5th Cir. 1995).  Once this showing is made, the burden shifts to the non-movant to identify specific evidence in the record showing that there is a material fact issue for trial and to state the "precise manner" in which the record supports his claims.  See ContiCommodity Servs., Inc. v. Ragan, 63 F.3d 438, 441 (5th Cir. 1995).  A summary judgment motion will not be defeated by the "existence of some alleged factual dispute."  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-48 (1986).  The non-movant must "do more than simply show there is some metaphysical doubt as to the material facts," Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986), and a mere scintilla of evidence does not suffice to prevent summary judgment, see Davis v. Chevron U.S.A., Inc., 14 F.3d 1082, 1086 (5th Cir. 1994).

7

### III. DISCUSSION

Louisiana law provides:

> A party may be obligated by a promise when he knew or should have known that the promise would induce the other party to rely on it to his detriment and the other party was reasonable in so relying. Recovery may be limited to the expenses incurred or the damages suffered as a result of the promisee's reliance on the promise. Reliance on a gratuitous promise made without required formalities is not reasonable.

LA. CIV. CODE ANN. art. 1967. The essential elements of a detrimental reliance theory of recovery in Louisiana are: (1) a representation by conduct or word; (2) justifiable reliance thereon; and (3) a change of position to one's detriment because of the reliance. See Breaux v. Schlumberger Offshore Servs., 817 F.2d 1226, 1230 (5th Cir. 1987) (citing John Bailey Contractor, Inc. v. State, 425 So. 2d 326, 328 (La. Ct. App. 1982), aff'd, 439 So. 2d 1055 (La. 1983)). Jobe need not prove the existence of a contract to establish his detrimental reliance claim, even in a context where a contract would normally govern. See Newport Ltd. v. Sears, Roebuck & Co., 6 F.3d 1058, 1069 (5th Cir. 1993) (citing Morris v. People's Bank & Trust Co., 580 So. 2d 1029, 1036 (La. Ct. App.), writ denied, 588 So. 2d 101, 102 (La. 1991); Morris v. People's Bank & Trust Co., 580 So. 2d 1037, 1043 (La. Ct. App. 1991)).

We must first identify the representations on which Jobe allegedly relied to his detriment. The district court indicated "some confusion as to the specific promise or representation allegedly made by the defendants" but read Jobe's pleadings as alleging that the defendants had represented (1) that "a sale had

8

been confected or a preliminary agreement reached," and (2) that the December 5, 1986 proposal's expiration date was "of no moment." Our review of Jobe's pleadings in the district court and his briefs on appeal reveals that his detrimental reliance claim is indeed based on defendants' alleged representations that ATR and Air New Orleans entered into an agreement for the sale of ATR-42 aircraft and that the expiration date for the December 5 proposal was not a firm deadline. In addition, Jobe suggested below, and argues vehemently on appeal, that he is entitled to relief because the defendants represented that they were bargaining in good faith when, in fact, they had no intention of selling ATR-42's to Air New Orleans. We address each of these alleged representations in turn.

The record does not support Jobe's claim that the defendants-appellees represented that ATR and Air New Orleans reached a preliminary agreement on the sale of ATR-42's to Air New Orleans. Air New Orleans's interrogatory answers state that "[a]t the conclusion of [the first Virginia] meeting, ANO believed that it had entered into a binding contract with ATR Marketing and the other Defendants for the delivery of six (6) ATR-42 aircraft." But the summary judgment evidence does not show that the defendants represented that a contract existed at any point prior to or during this meeting. Although Jobe alleges that ATR Marketing made a "written commitment" in September 1986, no such writing appears in the record. Furthermore, the testimony of Air New Orleans's own witness, Long, indicates that

9

no firm contract existed in the fall of 1986. Long stated that during the trip to the Farnsborough Air Show, he participated in "discussions" with Schmittle and Best, the "substance" of which was that Air New Orleans was "very interested in receiving the, acquiring the ATR 42, along with the financing package that included an over financing to allow cash fusion to Air New Orleans, and that ATR was quite interested in placing the airplanes with Air New Orleans." At his first meeting at ATR Marketing's Virginia headquarters, Long testified, Schmittle told him that "the acquisition of the airplanes was going forward," and while Long was "not sure that we finalized the fine points" of the deal, "we probably moved along in establishing the fine points." This testimony in no way demonstrates that the defendants represented that Air New Orleans had a binding contract for the purchase of ATR-42 aircraft.

Jobe also contends that, <u>after</u> the first Virginia meeting, the defendants represented that Air New Orleans had a contract to buy ATR-42's. In his deposition, for example, he testified that the December 5, 1986 proposal was, in fact, a written contract. That document does not represent that ATR and Air New Orleans had a binding contract, however; on the contrary, it states on its face that it is a "proposal" and an "offer" that was valid only until January 15, 1987, does not reflect any final agreement on the price of the aircraft or financing conditions, and concludes by expressing a hope that "the above proposal will be of interest" to Air New Orleans. Although Schmittle testified that

10

the December 5 proposal could have been accepted at any time, it is undisputed that Air New Orleans never did so, and our review of the record reveals no other evidence that the defendants-appellees represented that Air New Orleans had a binding contract to purchase ATR-42's.

Even assuming that the defendants did, in fact, make such a representation, the record demonstrates that Air New Orleans did not rely on it. Jobe's actions in December 1986 indicate that he did not believe that Air New Orleans had a firm contract. His December 2 letter requested a "proposal" from ATR, not a copy of the contract, so that Air New Orleans could demonstrate ATR's intentions "as they currently stand." At the Air New Orleans shareholders meeting, Jobe told attendees that the company was attempting to acquire "ATR-42s or British Aerospace Jetstreams" (emphasis added) and, as late as July 1987, Jobe informed Air New Orleans employees and Continental executives that Air New Orleans was considering purchasing Beech or Fairchild planes, omitting any mention of ATR-42's. Such conduct is inconsistent with Jobe's allegation that he relied on a representation that Air New Orleans had a firm contract to buy ATR-42's.

Moreover, under the circumstances, any reliance on a representation that Air New Orleans had a binding contract would have been unjustified. Although Jobe could not recall any other instance in which Air New Orleans purchased or leased aircraft without a written contract, he never signed a written purchase or lease agreement with the defendants. Furthermore, at no point

11

did the parties agree on certain major contract terms, including the exact price of each aircraft and the amount of the cash infusion to accompany each plane.  Nor did Air New Orleans ever obtain the support from Continental that ATR and ATR Marketing had demanded since October 1986.  Thus, the situation in this case is markedly different from that in Breaux, in which we held that the plaintiff reasonably relied on the defendant's written promise to rent a building because "[t]he terms of the lease, the price, the duration, and the square footage had been agreed to by the parties" and the plaintiff knew that the defendant had negotiated with signmakers, interior decorators, and architects to prepare the rented office space for its occupancy.  817 F.2d at 1231.

We next consider defendants' alleged representation that the December 1986 proposal's January 15, 1987 expiration date was "of no moment."  Although there is ample evidence that the defendants did make such a promise, Jobe does not explain how any reliance it placed on defendants' representation was detrimental, as Air New Orleans never attempted to accept the December 1986 offer. We therefore agree with the district court that "even if [the expiration dates's] extension was undisputed, that fact remains immaterial.  Again, Jobe has not indicated how or when any offer was accepted, or how or when any 'preliminary agreement' was reached."  Nor does a promise that an expiration date will be extended constitute a representation that the parties had an agreement for the purchase or lease of aircraft; indeed, such a

12

statement suggests that no agreement existed.  The defendants'
alleged representation that the putative deadline for acceptance
of the December 1986 proposal was "of no moment" cannot be the
basis for a detrimental reliance claim.

Finally, we turn to Jobe's assertion that defendants
represented that they were negotiating in good faith when, in
fact, they had no intention of selling ATR-42's to Air New
Orleans.  This argument states a claim for fraud, not detrimental
reliance.  See Automatic Coin Enters., Inc. v. Vend-Tronics,
Inc., 433 So. 2d 766, 768 (La. Ct. App.) (holding that a promise
made with the present intent not to perform constitutes fraud),
writ denied, 440 So. 2d 756 (La. 1983).[3]

Jobe fails to show that there is a genuine issue of material
fact with respect to his detrimental reliance claim.  The
defendants are therefore entitled to judgment as a matter of law,

---

[3]  Jobe also contends that the district court erred in
failing to draw an adverse inference from the defendants' failure
to produce certain reports of visits made by ATR Marketing
representatives to Air New Orleans.  A district court's refusal
to draw an adverse inference is reviewed for abuse of discretion.
See In re Evangeline Ref. Co., 890 F.2d 1312, 1321 (5th Cir.
1989).  The party requesting an adverse inference must first show
that the documents in question exist or existed and were within
the control of the opposing party.  See Brewer v. Quaker State
Oil Ref. Corp., 72 F.3d 326, 334 (3d Cir. 1995).  Although Jobe
claims that "[t]here is no question that the reports had been in
Defendants' possession," he points to no evidence in the record
supporting this assertion.  Moreover, a party seeking to obtain
an adverse inference based on non-production or destruction of
documents must show bad faith.  See Vick v. Texas Employment
Comm'n, 514 F.2d 734, 737 (5th Cir. 1975).  Jobe does not
identify, nor have we been able to find, any record evidence
showing bad faith on the part of the defendants.  We therefore
conclude that the district court did not abuse its discretion in
declining to draw an adverse inference from the non-production of
the trip reports.

and the district court properly granted it.

## IV. CONCLUSION

For the foregoing reasons, we AFFIRM the judgment of the district court.