DENNIS R. BAGNERIS, SR., Judge.
| plaintiffs, Alexander Gerhold, III and his wife, Janeene C. Gerhold, appeal the judgment of the district court granting a Motion To Enforce Settlement in favor of the defendants, William Giles and Progressive Security Insurance Company. Because the judgment in which the plaintiffs seek review is interlocutory, we hereby convert the appeal to a writ application, and consider plaintiffs’ arguments under our supervisory jurisdiction. Finding that the district court did not err in granting the Motion To Enforce Settlement, we hereby affirm.
FACTS AND PROCEDURAL HISTORY
On November 5, 2008, Alexander Ger-hold’s motorcycle struck the side of William Giles automobile at the intersection of Oleander Street and South Carrollton Avenue in New Orleans, Louisiana. On January 12, 2009, Mr. and Mrs. Gerhold filed suit against Mr. Giles and his insurer, Progressive Security Insurance Company, *1172 and Markel American Insurance Company, their UM/UIM carrier.
On February 8, 2009, plaintiffs’ prior attorney, Raymond Pelleteri, Jr., sent a letter to Mr. Giles’ attorney, Mr. Nat Kiefer, offering to settle for Progressive’s | -¿policy limits of $25,000 plus court costs. Specifically, the February 3rd letter states, in pertinent part, as follows:
In response to our recent telephone conversation, please be advised that I have met with my clients and have been authorized by them to extend the following offer to settle. In return for a full and final release of all claims against your insured, William H. Giles, Progressive will agree to pay the full policy limits, which you indicated to be $25,000.00, plus court costs.
This settlement will, of course, be contingent upon my clients being provided with a certified copy of Mr. Giles’ policy and a sworn affidavit that there are no other liability policies covering Mr. Giles for the negligence asserted in the Petition.
⅜ * *
Because of the serious nature of my client’s injuries, coupled with the amount of medical bills incurred to date, this offer will only remain open until 5:00 p.m. on Friday, February 20, 2009. If the offer is not accepted by that date and time it is withdrawn and we will proceed to secure a personal judgment against Mr. Giles.
On February 5, 2009, Mr. Pelleteri wrote to Progressive’s attorney, Sean Wagner, as well as to Mr. Kiefer, advising them of the court costs paid to date in regard to the settlement of this matter.
On February 6, 2009, Mr. Kiefer emailed a letter to Mr. Pelleteri advising that (1) Progressive agreed to accept plaintiffs’ settlement offer of $25,000 plus court costs; (2) advising that he ordered a certified copy of the policy and would obtain an affidavit from Mr. Giles; (3) that “per our agreement, plaintiff agrees to assume liability for any and all liens;” and (4) requesting the amount of court costs and payee information for the settlement check.
liiOn February 9, 2009, Mr. Kiefer mailed the following per the settlement agreement: (1) Progressive’s settlement check for the policy limits of $25,000 and $533.72 for court costs; (2) an original and two copies of Receipt and Release and Partial Motion to Dismiss Mr. Giles and Progressive from this matter; (3) the Affidavit of Mr. Giles dated February 9, 2008; and (4) a certified copy of the Progressive policy. However, by letter dated March 9, 2009, Mr. Pelleteri advised Mr. Kiefer that his clients refused to sign the settlement documents and that he had been discharged as plaintiffs’ counsel. On March 10, 2009, Mr. Pelleteri filed a Petition For Intervention.
On March 24, 2009, Mr. Giles and Progressive filed a Motion To Enforce Settlement based upon the fact that the correspondence exchanged between counsel for the parties clearly established the terms of the settlement, the terms of the settlement had been satisfied, and the matter was in fact settled.
On May 18, 2009, plaintiffs’ new counsel, Ms. Ermence DeBose-Parent filed a memorandum opposing Mr. Giles and Progressive’s Motion To Enforce Settlement. Specifically, plaintiffs argue that the letters between counsel cannot be considered a valid compromise, and alternatively, even if they can be so considered, plaintiffs never consented to settle for the amount alleged. Attached to the opposition memorandum are affidavits of Mr. and Mrs. Gerhold wherein they state that they never agreed to settle the matter with Progressive and Mr. Giles for $25,000, that they “never saw a copy of the letter pro *1173 posing the settlement until after we discharged Mr. Pelleteri,” and that they “made it clear to Mr. Pelleteri, from the beginning, that we would be, at the very least, seeking reimbursement of all medicals used as a result of this accident, as demonstrated by our producing to Mr. Pel-leteri the first medical bill in December, 2008, which exceeded $160,000.”
14Mr. and Mrs. Gerhold were deposed on July 15, 2009. Mr. Gerhold testified in his deposition that he acknowledged receiving the February 3rd letter and that Mr. Pel-leteri had in fact carbon copied him on the letter. Further, Mr. Gerhold testified that he did not have any contact with Mr. Pel-leteri after receiving the February 3rd letter until he went to his office to execute the settlement documents, at which time he told Mr. Pelleteri, for the first time, that he did not want to settle and that he was not signing the settlement documents.
Mr. Pelleteri was deposed on April 1, 2010. In his deposition, Mr. Pelleteri explained his proposed settlement plan as follows:
Q. Okay. I’m going to show you a letter, dated February 3, 2009, which I marked as “Exhibit 1,” and ask if you can identify that document?
A. Yes, I prepared that letter.
Q. All right. And who is the letter to?
A. It was to you. “Mr. Kiefer.”
Q. And what was the gist of the letter?
A. Well, the gist of the letter was essentially — a return for release of the action against Mr. Giles if Progressive would pay their full policy limits and certify that there was no other insurance available to Mr. Giles, and that Mr. and Mr. [sic] Gerhold would dismiss their case against Mr. Giles.
Q. And Progressive?
A. Yes, who was the insured [insurer]. Q. Would you agree pursuant to the February 3, 2009 letter, you as counsel of record on behalf of the Gerholds, made a settlement offer to Mr. Giles and Progressive that if Progressive would pay their policy limits of $25,000 plus court costs, that your clients would agree to release Mr. Giles and Progressive and dismiss the claim against them, assuming Progressive would pay the limits and provide the information you requested?
15A. By the date certain?
Q. Which was what?
A. February 20, 2009.
[[Image here]]
Q. What was your thinking and reasoning as to why you put a specific date on the offer in which you indicated that Progressive would not accept this proposal on or behalf [sic] February 20, '09 at 5:00 p.m. that the offer would be withdrawn, and that you would proceed to secure personal judgment against Mr. Giles? What was your reasoning behind that?
A. My reasoning was that, number one: I was only aware of the total of $75,000 worth of insurance. At the time the letter was written, Progressive’s official position on the case as far as I could determine was that they were denying liability. When the letter was sent, it was with the hope that Progressive would continue that position and expose their insured to an excess judgment. That was my reasoning.
Q. Okay. When you say it was your hope, why was it you hope that Progressive would not accept the proposal before the deadline? What would be the effect of that?
A. I think there would have been a good case for Progressive being arbitrary and capricious, and I think there would be an excellent action by Mr. Giles over and against Progressive for *1174 not paying the policy limits when they had the opportunity to do so....
[[Image here]]
Q. And by hoping you would trap them into missing the deadline, you felt that was in your clients’ best interest because therefore they may have a chance for Mr. Gerhold to collect 100 percent of his damages?
A. What his claim was worth.
Mr. Pelleteri also testified that he had the consent of his clients to send the settlement proposal set forth in the February 3, 2009 letter to Mr. Giles and Progressive. Specifically, Mr. Pelleteri testified as follows:
|fiQ. Now, Mr. Pelleteri, this is an important question as it relates to this case. In your February 3, '09 letter, you indicated that you had met with your clients and they had authorized you to make this settlement offer to Mr. Giles and Progressive, is that a true statement?
A. When I sent that letter, that was my belief.
Q. Did you have the consent and authority of your client when you sent this letter to propose this settlement?
A. I believe I did.
Q. And what did you base that on?
A. Well, I had met with Mr. and Mrs. Gerhold a third time — well, I made a third visit to their house with Mr. and Mrs. Gerhold before this letter was sent, and I laid out what I thought the situation was. I would say we spent a good 45 minutes to an hour talking this over. They asked questions about it, I was frank and I told them: The problem here is Progressive’s attorney is pretty experienced, and I don’t know if this is going to go, but I do believe this is the best shot.
Q. You’re talking about the trap plan?
A. The trap plan yes. I don’t think I described it as a trap plan, but that is what I was trying to do.
Q. Do you have a date when you met with them that third time before you sent the February 3, 2009 letter?
A. It was shortly before then, but I can’t recall a specific date.
Q. When you met with them a third time, and this is before you sent the February 3, 2009 letter and you laid out for them the fact that you were going to offer the 25,000 with a deadline in the hope that Progressive would not accept it? As their attorney, you had no question that they had agreed and consented to you sending this February 3, '09 letter?
A. That was my belief. All I can say is that was my belief based upon the conversation with Mr. and Mrs. Gerhold.
[[Image here]]
|7Q. Okay. Prior to your receipt of the February 9, '09 letter with the enclosures, which we’ve marked as Exhibit 4, had you ever received any contact from either Mr. or Mrs. Gerhold advising you that you did not have their authority and consent as their counsel to enter into the settlement agreement as per your letter of February 3, '09?
A. I don’t recall any contact with Mr. and Mrs. Gerhold until I called them to tell them that I had gotten confirmation from you on behalf of Progressive that the settlement that we had put out there was accepted. That’s when Mr. Gerhold said he couldn’t settle for that. So that was it.
[[Image here]]
Q. Would it be fair to say that this indication from the Gerholds that they did not want to go forward with the settlement only came about after the settlement agreement had been reached between the parties?
*1175 A. I would say that’s an accurate statement.
On December 17, 2010, a hearing was held on the Motion To Enforce Settlement. However, the district court kept the hearing open to allow Progressive to submit either an affidavit or deposition testimony from Mr. Pelleteri as to whether the initial settlement offer made by Mr. Pelleteri on behalf of plaintiffs included the outstanding medical lien and whether the Mr. Kiefer’s acceptance letter changed the terms of the agreement. On March 11, 2011, Progressive submitted a supplemental memorandum that included an affidavit of Mr. Pelleteri wherein he confirmed that the scope of the initial settlement offer did in fact include the liens and that he had the authority and consent of Mr. and Mrs. Gerhold to enter into the settlement negotiations. Specifically, Mr. Pelleteri’s affidavit states as follows:
(4) The settlement offer I made in my letter dated February 3, 2009 for the policy limits plus court costs did | sin fact encompass any and all outstanding medical liens and/or privileges being asserted against any available insurance proceeds ...
[[Image here]]
(6) In defendants’ acceptance dated February 6, 2009, counsel for defendants, Nat G. Kiefer, Jr., correctly set forth our agreement in which he stated that following:
“As per our agreement, plaintiff agrees to assume liability for any and all liens.”
(7) Defendants’ acceptance letter dated February 6, 2009 did not in any way change the terms and/or conditions set forth in my settlement letter dated February 3, 2009 since my original settlement offer for the policy limits included the plaintiffs assuming any and all liability for any outstanding liens.
On April 8, 2011, after a hearing, the trial court granted Mr. Giles and Progressive’s Motion to Enforce Settlement.
APPELLATE JURISDICTION
Before reaching the merits of this appeal, we first must address the jurisdictional issue of whether the trial court’s judgment is a final judgment for purposes of immediate appeal under La. C.C.P. art. 1915. Mr. Giles and Progressive argue that plaintiffs’ appeal should be dismissed as they have no right to appeal the district court’s April 21, 2011 judgment since it did not dispose of the entire matter, did not include the dismissal of any parties, and did not include any designation by the district court that said judgment was final and that there was no just reason to delay the appeal. We agree.
The April 21, 2011 judgment only granted the defendants’ Motion To Enforce Settlement; the judgment is devoid of any language dismissing any of the parties and the judgment does not dispose of the entire matter. Further, the trial court did not certify the judgment as final for purposes of appeal under La. C.C.P. |9art. 1915. As such, the proper procedural vehicle to seek review of an interlocutory judgment that is not immediately appeal-able is an application for supervisory writ. La. C.C.P. art. 2083. Because the plaintiffs timely filed their appeal within the delays allowed for applying for supervisory writs [1] we hereby convert plaintiffs’ appeal to an application for supervisory writ and will consider the plaintiffs’ arguments under our supervisory jurisdiction.
STANDARD OF REVIEW
A court of appeal may not set aside a trial court’s finding of fact in the *1176 absence of manifest error or unless it is clearly wrong. Rosell v. ESCO, 549 So.2d 840 (La.1989). Where there is conflict in the testimony, reasonable evaluations of credibility and reasonable inferences of fact should not be disturbed upon review, even though the appellate court may feel that its own evaluations and inferences are as reasonable. Id. Reversal of findings of fact on appeal requires that: (1) the appellate court find from the record that no reasonable factual basis exists for the trial court’s finding, and (2) the appellate court determine that the record establishes the finding is clearly wrong or manifestly erroneous. Stobart v. State through Dept. of Trans. and Development, 617 So.2d 880 (La.1993).
DISCUSSION
In their sole assignment of error, plaintiffs argue the trial court erred in holding that the letters between the attorneys constitute a valid compromise and that even if it is a compromise, the compromise should be rescinded because (1) counsel failed to fully clarify and agree upon the terms of the agreement; and (2) plaintiffs refused to sign the settlement documents.
ImLouisiana Civil Code Article 3071 defines a compromise as “a contract whereby the parties, through concessions made by one or more of them, settle a dispute or an uncertainty concerning an obligation or other legal relationship.” A compromise “shall be in writing or recited in open court,” and may be contained in two writings rather than one. See La. C.C. art. 8072, 2007 Revision Comment (c). Further, compromises are favored in the law and the burden of proving the invalidity of such an agreement is on the party attacking it. Elder v. Elder & Elder Enterprises, Ltd., 2006-0703, p. 4 (La.App. 4 Cir. 1/11/07), 948 So.2d 348, 351.
In the instant case, plaintiffs argue that because they did not sign the Receipt and Release actually releasing Mr. Giles and Progressive from further liability, there is no settlement to enforce. Further, plaintiffs allege that the settlement documents do not reflect the intent of the parties and do not satisfy the requirements for a valid compromise. However, the evidence indicates that the plaintiffs did in fact offer to settle their claims against Mr. Giles and Progressive in writing in exchange for Progressive’s policy limits plus court costs as long as they were provided with a certified copy of the Progressive policy and an affidavit from Mr. Giles attesting to the fact that he had no other insurance that would provide coverage for the sued upon claims. In turn, Progressive accepted the plaintiffs’ offer in writing. Mr. Pelleteri’s affidavit confirms that the initial settlement offer made by him on behalf of the plaintiffs included the outstanding medical liens. From reviewing the depositions and affidavits in the record, we find no manifest error in the district court’s finding that plaintiffs’ prior attorney, Mr. Pelleteri, had the authority and consent of his clients to enter into the settlement agreement with Mr. Giles and Progressive and that the parties had reached a valid, enforceable settlement agreement.
|nFor the foregoing reasons, we convert this appeal to an application for supervisory writ. We grant the application for writ, and affirm the judgment of the trial court, which granted Mr. Giles and Progressive’s Motion To Enforce Settlement.
APPEAL CONVERTED TO A WRIT APPLICATION; WRIT APPLICATION GRANTED; JUDGMENT AFFIRMED

. The judgment was signed on April 21, 2011. Plaintiffs' notice of appeal was filed on May 17, 2011 and the district court signed the order granting the appeal on May 19, 2011.