| | | |
|---|---|---|
| **NOLA TITLE COMPANY, L.L.C.** | * | **NO. 2022-CA-0697** |
| | * | |
| **VERSUS** | | **COURT OF APPEAL** |
| | * | |
| **ARCHON INFORMATION SYSTEMS, LLC D/B/A CIVICSOURCE, CIVICSOURCE HOLDINGS, LLC, CIVICSOURCE TITLE, LLC, MISSISSIPPI GUARANTY COMPANY, BRYAN BARRIOS, MICHAEL KIRSCHMAN AND STEPHEN MOREL** | * | **FOURTH CIRCUIT** |
| | | **STATE OF LOUISIANA** |
| | * * * * * * * | |

APPEAL FROM
CIVIL DISTRICT COURT, ORLEANS PARISH
NO. 2016-07939, DIVISION "L"
Honorable Kern A. Reese, Judge
* * * * * *
**Judge Rosemary Ledet**
* * * * * *

(Court composed of Judge Rosemary Ledet, Judge Sandra Cabrina Jenkins, Judge Nakisha Ervin-Knott)

Randall Alan Smith
J. Geoffrey Ormsby
Dylan T. Leach
SMITH & FAWER, L.L.C.
201 St. Charles Avenue, Suite 3702
New Orleans, LA 70170

        COUNSEL FOR PLAINTIFFS/APPELLEES

James M. Garner
Peter L. Hilbert, Jr.
Joshua Simon Force
David Freedman
SHER GARNER CAHILL RICHTER KLEIN & HILBERT, LLC
909 Poydras Street, Suite 2800
New Orleans, LA 70112

        COUNSEL FOR DEFENDANT/APPELLANT

 **APPEAL CONVERTED TO APPLICATION FOR SUPERVISORY WRIT; WRIT GRANTED; RELIEF DENIED**
**April 13, 2023**

This is a commercial litigation case. Although this case has been pending since 2016 and was consolidated with a case filed in 2017, the designated record of this appeal starts with a motion to enforce compromise ("Motion to Enforce") filed on June 16, 2022. The Motion to Enforce was filed by the plaintiffs—NOLA Title Company, LLC ("NOLA"), and alternatively, Frederick E. Yorsch ("Mr. Yorsch"), derivatively as member and manager of NOLA (collectively "NOLA Title").[1] From the trial court's August 1, 2022 judgment granting the Motion to Enforce, the defendant—Archon Information Systems, L.L.C. ("Archon")—appeals. For the reasons that follow, we convert Archon's appeal to a supervisory writ, grant the writ, but deny relief.

## FACTUAL AND PROCEDURAL BACKGROUND

In the underlying consolidated cases, the claims asserted by the parties against each other relate to disputes arising out of the parties' previous contractual

---

[1] The record on appeal does not contain a copy of the petitions filed in the underlying consolidated suits. Based on the consolidated matter caption, the parties to the suits are as follows. The 2016 suit was filed by NOLA and derivative plaintiff, Mr. Yorsch, against multiple defendants including Archon and Stephen Morel. The 2017 suit was filed by Archon against NOLA Title. For ease of discussion, we refer the parties in their capacities in the 2016 suit.

relationship. During discovery, Archon learned that Mr. Yorsch, a member of NOLA Title, had secretly recorded numerous pre-litigation conversations with Archon's executives. In a discovery response,[2] Mr. Yorsch produced over forty hours of secret audio recordings involving Archon's executives (the "Recordings"). According to Bryan Barrios, Archon's chief executive officer ("CEO"), the Recordings contained snippets of content of a sensitive nature that might implicate the professional and reputational interests of Archon and its executives. It is undisputed that the content of the Recordings is unrelated to the underlying suit. The Recordings, however, are the focus of the instant dispute over the validity and enforceability of the purported compromise.

In May 2021, Archon retained the Bezou Law Firm to represent it in this case. Jacques Bezou was lead counsel; Stacy Palowsky, another attorney at the Bezou firm, handled everything leading up to trial preparation. Ten months after the Bezou firm was retained, this case was scheduled for a three-day jury trial. Trial was to commence on Monday, March 21, 2022.

On the Friday before the scheduled trial, another attorney from the Bezou Firm, Payton Lachney, went to Civil District Court to test playing trial exhibits on courtroom equipment. While Mr. Lachney was in the courtroom meeting with the trial court's information technology ("IT") staff and testing the courtroom equipment, an individual, who identified himself to Mr. Lachney as a member of the NOLA Title litigation team, was also present in the courtroom performing the same task. Mr. Lachney spotted—either on the courtroom screens or on the other

---

[2] According to Archon, the trial court, in November 2018, ordered Mr. Yorsch to "produce complete and full copies of all video and/or audio recordings capturing, recording, or depicting conversations or interactions between the Parties to this litigation." In response, Mr. Yorsch produced the Recordings.

individual's computer screen, or both—an open audio recording regarding Mr. Barrios. According to Mr. Lachney, the audio recording confirmed to him that NOLA Title intended to play an irrelevant, but prejudicial, audio recording at trial. This spotting, which Mr. Bezou reported by e-mail to Mr. Barrios, spurred settlement negotiations between the parties.

Over the weekend before trial, the parties' principals—Archon's CEO, Mr. Barrios, and NOLA Title's member, Mr. Yorsch—engaged in settlement negotiations. Text messages and a phone conversation between the principals culminated in an oral, telephonic agreement to settle the case. The text messages between them did not mention the Recordings. At 10:30 a.m. that Sunday, Mr. Barrios sent an e-mail to Ms. Palowsky stating that Mr. Yorsh was "calling Geoff [Ormsby, NOLA Title's counsel,] with the instruction to settle for $375[,000]."

Around noon that Sunday, Mr. Ormsby notified the trial court of the parties' agreement to settle the case. Mr. Ormsby did so in an e-mail to the trial judge's law clerk, which stated that "[t]he parties have reached a settlement, which should be finalized this afternoon." In the e-mail, Mr. Ormsby also requested that "the court not take Monday's trial off the docket until the agreement is reduced to writing later today." Ms. Palowsky forwarded Mr. Ormsby's e-mail to Mr. Barrios. Mid-afternoon that Sunday, Mr. Barrios e-mailed Ms. Palowsky inquiring about the draft of a proposed written settlement agreement.

Counsel for the parties exchanged e-mails during the day on Sunday regarding what they planned to put on the record on Monday morning regarding the settlement.[3] Later that Sunday evening, around 6:00 p.m., Mr. Ormsby e-mailed

---

[3] At 2:43 p.m. on Sunday, Ms. Palowsky e-mailed Mr. Ormsby, stating "we definitely need to know what you want on the record, so let us know." At 2:59 p.m. on Sunday, Mr. Ormsby

3

Ms. Palowsky a draft of an agreement, captioned "Settlement and Release Agreement." Thirty minutes later, Ms. Palowsky e-mailed Mr. Ormsby stating that she could not "see an agreement on a full release agreement by the morning" and that she "thought we would get basic terms down in writing and on the record in the morning." She further stated that she was going to review the draft now and forward it to Mr. Barrios. Contemporaneously, Ms. Palowsky e-mailed a copy of the draft to both Mr. Barrios and Archon's Chief Operating Officer ("COO"), Dan Rebeor.

At 6:39 p.m. that Sunday, Mr. Ormsby e-mailed Ms. Palowsky that the "[d]eal is amount and payment and effective date—we can work on other language—we can take out [Mr.] [B]arrios [and] [Mr.] [K]irschman but trying to end everything." About an hour later, Ms. Palowsky again e-mailed Mr. Barrios and Mr. Rebeor and informed them that "we don't have to have the release signed in the morning, so we have time to deal with [the release]" and that "[w]e just need to put on the record the amount of the two payments, to whom the two payments will be made, and when." In essence, Ms. Palowsky informed them that the payment terms were what was to be put on the record in the morning.

About thirty minutes later, Mr. Barrios e-mailed Ms. Palowsky the following bullet list of his comments regarding the draft, which were as follows:

- Barrios and Kirschman individually do not need to appear or be included in a settlement of a case they've already been dismissed from.

---

replied that he would let Archon know what was going to be put on the record, but he was "[r]eally thinking this out." At 3:03 p.m. on Sunday, Ms. Palowsky e-mailed Mr. Ormsby asking if it "[w]ould be better to just have the court take it off the docket and tell them we'll submit something later to give you time to figure it out?" At 4:25 p.m. on Sunday, Ms. Palowsky e-mailed Mr. Ormsby that they would be at Court in the morning and repeated the request that Mr. Ormsby "please send what you want to put on the record this evening."

- Morel's dismissal also (magically) dismissed him from the WFG suit. That should be included.

- You're welcome to keep May 22, 2022 as a date for one payment, but not both. This isn't an insurance claim.

- There will be a paragraph addressing the recordings.

Fifteen minutes later, Ms. Palowsky e-mailed Mr. Barrios and addressed each of his comments. She stated that "we can take you and [Mr.] Kirschman out"; that she would add Morel's dismissal; that she would "tell [Mr. Ormsby] there will only be one payment"; and "[o]k on recordings." Five minutes later, Ms. Palowsky e-mailed Mr. Ormsby that "[w]e'll definitely have to include some other things in the release that [Mr. Barrios] wants." But, Ms. Palowsky did not mention to Mr. Ormsby that one of the things Mr. Barrios wanted included in the written agreement was a paragraph addressing the Recordings.

Later that Sunday night, Ms. Palowsky and Mr. Ormsby exchanged e-mails regarding the payment terms—the number of payments (one versus two) and the payments schedule (timing). According to Ms. Palowsky, she received a phone call from Mr. Barrios that evening. During that phone call, Mr. Barrios screamed at Ms. Palowsky for misreading his instruction regarding the payment terms. Ms. Palowsky then sent an e-mail to Mr. Ormsby, stating: "I apologize, I misread an e-mail from Bryan [Barrios]. He will write two checks to total the agreed upon settlement amount, but the second one won't be until August 22."

On Monday morning (March 21, 2022)—the day the trial was scheduled to commence, counsel for Archon—Mr. Bezou and Ms. Palowsky—and for NOLA Title—Mr. Ormsby—appeared before the trial court for a conference. A member of NOLA Title—Mr. Yorsch—was also present. No executive or officer of Archon was present. The following colloquy was put on the record:

MR. ORMSBY:

Your Honor, again, Geoffrey Ormsby. Subject to, subject to a more formal agreement, what we'd like to put on the record today is the fact of the settlement and some other—and other terms. And if I forget any, Ms. Palowsky, of course, can fill it in.

Archon and the derivative plaintiff, Your Honor, have agreed to a settlement in the amount of $375,000, paid to the derivative plaintiff and dismissing NOLA Title as a defendant from the case.

That $375,000 settlement will release all parties from the case. The payment for that is gonna be split in two, Your Honor. The payment—The first payment will be due May twenty—I'm sorry.

MS. PALOWSKY:

June 3rd, 90 days.

MR. ORMSBY:

No. I thought the first one to us was 60, and then the other was 90 and 150. That's what you said. There was no problem with the first check.

THE COURT:

Hold on. Let them have this off-the-record discussion.

(An off-the-record discussion is held.)

During the off-the-record discussion, Ms. Palowsky called Mr. Rebeor, Archon's COO, to get clarification on the settlement terms. Mr. Rebeor patched in Mr. Barrios, Archon's CEO, during the call. After the call, counsel for all parties went back on the record. Thereafter, the following colloquy was put on the record:

MR. ORMSBY:

We're gonna start over again.

THE COURT:

Ironed out the wrinkles?

MR. ORMSBY:

6

Yes .

THE COURT:

All right. Good enough.

THE COURT:

Anyway, go ahead.

MR. ORMSBY:

Laurie, if we can wipe the slate clean—The parties have agreed. Your Honor, that Archon will pay to the derivative plaintiff the amount of $375,000. One-half of that amount will be paid on May 21, 2022, to Smith & Fawer, L.L.C. [NOLA Title's counsel], for legal fees and any unpaid costs or expenses incurred on behalf of prosecuting the derivative lawsuit.

A second check will be tendered to the derivative plaintiff on August 21, 2022, in the amount of $187,500, which is one-half of the total settlement amount. The $187,500 will be paid to the derivative plaintiff, Mr. Yorsch, and NOLA Title Company. So they will both be on the check.

Mr. Yorsch personally agrees to indemnify Archon from any claims that may be brought on behalf of NOLA Title, the entity, and/or the liquidator for that company.

The parties both agree to dismiss any respective claims between them with prejudice.

Additionally, the derivative plaintiff has resolved any and all claims against Stephen Morel, defendant Stephen Morel, and those claims have been settled with consideration given by both parties.

Finally, Archon will agree to dismiss NOLA Title in the lawsuit from the direct claim brought by Archon.

MR. BEZOU:

May it please the Court, this is Jacques Bezou again. I just want to say one thing. Stacy [Palowsky] will follow after me. Since the first check is written to the firm, I would like Mr. Yorsch, who is here, to accede to that on the record.

7

THE COURT:

I was going to query him on the settlement. No problem, Mr. Bezou.

Yes, ma'am.

MS. PALOWSKY:

No, I don't have anything to add. That covers it.

The trial court judge, on the record, questioned Mr. Yorsch as to whether he agreed with the terms that had been recited. The trial court also clarified that the terms that had been recited would "constitute a full and final settlement of this matter" and that "because this is going on the record, this constitutes a settlement of the matter, and that will resolve it." Then, the trial court questioned counsel as to whether they were authorized to enter into this settlement on behalf of their respective clients. Ms. Palowsky—identifying Archon as her client—answered affirmatively. The trial court judge closed by stating that he "expected a motion to dismiss the matter once all closing documents [which he identified as a confected judgment and release and receipt] have been executed."

Two weeks later, Archon dismissed the Bazou Law Firm as its counsel and replaced them with the Sher Garner Firm. Two months later, Mr. Ormsby forwarded a draft of a receipt and release agreement to the Sher Garner Firm, indicating that the document "simply memorializes the agreement put on the record on March 21, 2022." The Sher Garner Firm refused to sign the draft; instead, the Sher Garner Firm demanded that multiple other provisions be added.

By e-mail dated May 18, 2022, Mr. Ormsby replied to Sher Garner Firm's proposed additions as follows:

- [W]e cannot accept any provision regarding the audio recordings, as it was not part of the settlement. Furthermore, Mr. Yorsch has no idea who may have the recordings and they were produced in discovery, and thus he has no way to control the use or dissemination of the tapes by anyone else but himself and the undersigned. He cannot accept potential liability for the acts of other[s] not in his control. That said, Mr. Yorsch sees no reason why he would use, provide, or publish the recordings, as he does not care to create any future issues with Mr. Barrios. For these reasons, he will not enter into any agreement in that regard.

- We will also not agree to an attorney's fee provision or the disparagement clause, as those were never agreed to and could only lead to more litigation between our respective clients.

- Lastly, the two (2) payment dates must remain specific, despite the first date falling on a Saturday.

- We do agree to Mr. Yorsch's indemnity obligation as to the liquidator, as that was indeed part of the settlement read into the record on March 21, 2022.

As Mr. Ormsby's e-mail reflects, the Sher Garner Firm requested adding multiple provisions to the proposed draft, including a non-disclosure provision regarding the Recordings, a non-disparagement provision, and an attorney's fees provision.

Given the first payment was delinquent (it was due May 21, 2022) coupled with the dispute regarding the existence of a compromise, NOLA Title filed the Motion to Enforce on June 16, 2022. In support of the Motion to Enforce, NOLA Title attached a copy of the March 21, 2022 transcript. In the Motion to Enforce, NOLA Title contended that Archon, through the Sher Garner Firm, was seeking to impose additional terms to the agreed-upon settlement that were never discussed before or as the settlement was being read into the record.

Opposing the Motion to Enforce, Archon contended that the compromise was invalid for two reasons: (i) Archon's former counsel (Ms. Palowsky), although believing she was authorized to enter the compromise, actually lacked the

9

authority; and (ii) even if former counsel was authorized, the compromise was invalid because it failed to include a key element of the parties' agreement—a provision regarding the Recordings. In support of its opposition, Archon attached two affidavits. The first affidavit was from Mr. Lachney; in his affidavit, Mr. Lachney attested that while meeting with the court's IT staff on the Friday before the trial, he spotted the audio recording that spurred the settlement negotiations. The second affidavit was from Mr. Barrios—Archon's CEO. In his affidavit, Mr. Barrios attested to the following:

- I did not approve or authorize anybody to agree on behalf of Archon to a settlement that included only the terms recited on the record on March 21, 2022

- Archon did not agree and has never agreed to the terms of supposed settlement that included only the terms recited on the record on March 21, 2022.

- It has always been a primary purpose of Archon in agreeing to settle that there would be terms in the settlement agreement addressing [the Recordings]. The [Recordings] were the entire basis for my willingness to settle, as there was nothing to prove any of NOLA Title's allegations against Archon.[4]

---

[4] Mr. Barrios additionally attested to the following:

- Before March 21, 2022, I personally instructed that any settlement agreement of this matter include a paragraph addressing the audio recordings. Archon did not agree, and would not have agreed, to any settlement agreement that did not address those audio recordings.

- Within the more-than forty hours of audio recordings secretly made by Mr. Yorsch, there are snippets of content of a sensitive nature that may implicate professional and reputational interests. It has always been my understanding that any final settlement agreement would address Mr. Yorsch's audio recordings.

- Mr. Yorsch and/or NOLA Title have refused to include in the settlement agreement any provision relating to those audio recordings. Mr. Yorsch and/or NOLA Title have also refused to include an anti-disparagement clause. These facts are particularly problematic considering that Mr. Yorsch has represented that he is a competitor of Archon.

Given the conflict between Mr. Barrios' attestations denying Archon's approval of its former counsel's authorization to enter the settlement that was recited into the record and Ms. Palowsky's statement on the record that she had such authority, the trial court set an evidentiary hearing to address the authorization issue. At that hearing, two witnesses testified—Mr. Barrios and Ms. Palowsky.[5] At the close of the hearing, the trial court concluded that the parties' recitations on the record on March 22, 2022 constituted a binding settlement agreement and that Ms. Palowsky was authorized to consent to that settlement on Archon's behalf. The trial court, thus, granted the Motion to Enforce. This appeal followed.

**APPELLATE JURISDICTION**

Regardless whether the parties raise an appellate jurisdiction issue, an appellate court has a duty to determine whether it has jurisdiction to entertain an appeal. *See S. Envtl. Mgmt. & Specialties, Inc. v. City of New Orleans*, 22-0018, p. 4 (La. App. 4 Cir. 5/11/22), 339 So.3d 1234, 1237. Here, the trial court's judgment only grants the Motion to Enforce; the judgment is devoid of any language dismissing any of the parties or disposing of the entire case. Nor did the trial court certify the judgment as final for purposes of appeal under La. C.C.P. art. 1915. The judgment, thus, is "a non-final, interlocutory judgment, which is not appealable." *Myers v. Diaz*, 22-0445, p. 3 (La. App. 1 Cir. 11/4/22), 354 So.3d 78, 81 (citing La. C.C.P. arts. 1915, 2083, and 1841); *800 Iberville St. Ltd. P'ship v. V Rest. Grp., L.L.C.*, 16-0799, 16-0483, pp. 5-6 (La. App. 4 Cir. 6/7/17), 221 So.3d 205, 209; *Gerhold v. Giles*, 11-0992, pp. 8-9 (La. App. 4 Cir. 1/25/12), 83 So.3d 1170, 1175.

---

[5] For ease of discussion, we summarize the two witnesses' testimony elsewhere in this opinion.

The proper procedural vehicle to seek review of an interlocutory judgment is by filing a supervisory writ. *See* La. C.C.P. art. 2201.[6] Given Archon's appeal was timely filed within the delays allowed to file a supervisory writ,[7] we convert Archon's appeal to a writ and address Archon's arguments under our supervisory jurisdiction.

## STANDARD OF REVIEW

This court reviews a trial court's judgment granting a motion to enforce a compromise agreement under a manifest error standard. *800 Iberville St. Limited P'ship*, 16-0799, pp. 7-8, 221 So.3d at 210 (citing *Howard v. La. Citizens Prop. Ins. Corp.*, 10-1302, pp. 2-3 (La. App. 4 Cir. 4/27/11), 65 So.3d 697, 699). As this court has observed, "[t]he trial court's judgment determining the existence, validity and scope of a compromise agreement depends on a finding of the parties' intent, which is an inherently factual finding." *Morris, Lee & Bayle, LLC v. Macquet*, 14-1080, p. 14 (La. App. 4 Cir. 3/23/16), 192 So.3d 198, 208. Here, as in civil cases in general, the trial court's factual findings are reviewed under a manifest error standard. *Hall v. Folger Coffee Co.*, 03-1734, p. 9 (La. 4/14/04), 874 So.2d 90, 98.[8] With these principles in mind, we address the issue presented by this appeal.

[6] La. C.C.P. art. 2201 provides that "[s]upervisory writs may be applied for and granted in accordance with the constitution and rules of the supreme court and other courts exercising appellate jurisdiction."

[7] We acknowledge, as Archon points out in its brief, that this court in *Coppage v. Transdev Servs., Inc.*, 20-0419 (La. App. 4 Cir. 3/19/21), 320 So.3d 1206, *writ denied*, 21-00549 (La. 6/8/21), 317 So.3d 328, addressed a judgment granting a motion to enforce a settlement on appeal. This court in *Coppage*, however, neither mentioned nor addressed the jurisdictional issue. Archon's reliance on *Coppage* is, thus, misplaced.

[8] Commenting on that standard, the Louisiana Supreme Court has observed that "[w]here there are two permissible views of the evidence, the factfinder's choice between them cannot be manifestly erroneous or clearly wrong." *Rosell v. ESCO*, 549 So.2d 840, 844 (La.1989). Emphasizing these principles, the Supreme Court in *Menard v. Lafayette Ins. Co.*, 09-1869, pp. 21-22 (La. 3/16/10), 31 So.3d 996, 1011, remarked:

Rarely do we find a *reasonable* basis does not exist in cases with opposing views. We note it is not hard to prove a *reasonable* basis for a finding, which makes the

12

The requirements for a valid and enforceable compromise that are pertinent here are set forth in the following four Louisiana Civil Code articles:

- La. C.C. art. 3071—"A compromise is a contract whereby the parties, through concessions made by one or more of them, settle a dispute or an uncertainty concerning an obligation or other legal relationship."

- La. C.C. art. 3072—"A compromise shall be made in writing or recited in open court, in which case the recitation shall be susceptible of being transcribed from the record of the proceedings."

- La. C.C. art. 3076—"A compromise settles only those differences that the parties clearly intended to settle, including the necessary consequences of what they express."

- La. C.C. art. 3082—"A compromise may be rescinded for error, fraud, and other grounds for the annulment of contracts. Nevertheless, a compromise cannot be rescinded on grounds of error of law or lesion."

The jurisprudence has developed the following principles that are pertinent here:

- "Although attorneys are presumed to have the authority to negotiate a settlement proposal for their clients, attorneys may not enter into a binding agreement without their client's clear and express consent." *Tran v. Allstate Ins. Co.*, 01-0675, p. 5 (La. App. 4 Cir. 12/27/01), 806 So.2d 103, 106 (quoting *Dammann v. Molero*, 97-1944 p. 3 (La. App. 4 Cir. 3/18/98), 709 So.2d 344, 345).[9]

- "Recital of settlement agreements in open court must make full disclosure of the terms so that all parties involved are fully appraised of their rights and obligations." *Abadie v. Metro. Life Ins. Co.*, 97-932 to 97-940, p. 3 (La. App. 5 Cir. 4/9/98), 712 So.2d 932, 934.

---

manifest error doctrine so very difficult to breach, and this is precisely the function of the manifest error review. A reviewing court only has the "cold record" for its consideration while the trier of fact has the "warm blood" of all the litigants before it. This is why the trier of fact's findings are accorded the great deference inherently embodied in the manifest error doctrine. So once again we say it should be a rare day finding a manifest error breach when two opposing views are presented to the trier of fact. (emphasis in original).

[9] La. C.C. art. 2997 provides that authority must be given expressly "to [e]nter into a compromise."

- "A settlement agreement may be binding even if it is subject to later formalities that do not occur." *Saeed v. Kamboj*, CV 17-13427, 2019 WL 3526710, at *4 (E.D. La. June 21, 2019) (internal citation and quotations omitted).

- "[W]hen a settlement is in writing, even if it does not encompass all of the issues between the parties, it nonetheless is a legally binding agreement as to the terms it does encompass." *Id.* (citing *Walk Haydel & Assocs., Inc. v. Coastal Power Prod. Co.*, 98-0193, p. 4 (La. App. 4 Cir. 9/30/98), 720 So.2d 372, 374).

Applying the pertinent codal articles and jurisprudential principles here, the trial court reached the following conclusions at the end of the evidentiary hearing:

> [W]hat was recited to the Court on March 21 of 2022 was a settlement of the proceedings for the amount of $375,000.

> The other terms, a transition in attorneys changed the dynamic. All the things that were probably going to be resolved were not resolved and I don't even know, based upon what I heard today, were capable of being resolved; *i.e.*, this infamous recording that Mr. Yorsch may or may not have control of was a bone of contention in the case.

> Very simple process. In my estimation, a deal is a deal. A deal was made, recited on the record of the court. A representation was made to the Court that the attorney had authority to go into the settlement. And the attorney did have the authority to make the settlement on the amount. I think there was a meeting of the minds on that.

> There was no recitation of the recording in the settlement agreement. And there's a little buyer's remorse at the end because that wasn't included, or the terms changed.

> What was put on the record, in this Court's estimation, based on the law, based on the jurisprudence, based on the testimony of the witnesses who testified today, again, was a viable settlement.

> So for those reasons, the Court grants the Motion to Enforce Settlement in the amount of $375,[000] as attested to on March 21, 2022.

Although Archon assigns numerous errors,[10] we frame the issue presented as whether the trial court erred in finding that the purported settlement agreement

---

[10] Archon's assignment of errors are as follows:

recited into the record on March 21, 2022 is a valid and an enforceable compromise.[11] Archon contends the trial court so erred. In support, Archon argues that there was no meeting of the minds—and thus no compromise—for three reasons:

- The parties contemplated a formal, written settlement agreement would be confected;

- A material term—the Recordings—was missing from the terms the parties recited on the record; and

- Archon's former counsel lacked express authority to enter into a compromise that included only the terms recited on the record.

We subdivide our analysis into three parts corresponding with these three issues.

*Formal, Written Settlement Agreement Not Contemplated*

A compromise, by codal definition, is a form of contract. *See* La. C.C. art. 3071. The rules of contractual agreement apply to compromise agreements.

---

I.     The District Court erred in granting NOLA Title's Motion to Enforce Settlement Agreement and holding that a binding and enforceable settlement agreement exists between Archon and NOLA Title.

II.    The District Court erred in concluding that a meeting of the minds between the parties existed as to all material terms of settlement.

III.   The District Court erred to the extent that it concluded that the parties orally confected a settlement agreement on March 20, 2022.

IV.    The District Court erred in concluding that Archon's counsel had authority to bind Archon to a purported settlement that did not include material terms that Archon had explicitly instructed to be included in the settlement.

V.     The District Court erred in concluding that there was an enforceable settlement agreement based on an incomplete recitation in open court of some (but not all) settlement terms considering that the recitation was made explicitly subject to a more formal agreement that the parties ultimately could not execute due to disagreements over material terms.

[11] Although the terms settlement and compromise are often used interchangeably, the legal term for the type of agreement at issue is a compromise. As this court has observed, "'[t]he settlement [to end litigation] reached by the parties in this case is what is known in Louisiana law as a transaction or compromise.'" *Alexius v. Booth*, 20-0332, p. 2 (La. App. 4 Cir. 1/13/21), 312 So.3d 1122, 1123, n. 2 (quoting *Cochennic v. City of New Orleans Through Mosquito Control Unit of Health Dep't of City of New Orleans*, 98-0464 (La. App. 4 Cir. 11/10/98), 722 So. 2d 325, 327).

Louisiana jurisprudence has recognized that a "so-called preliminary agreement may be binding, even though it refers to a future written agreement finalizing its contents." *Newport Ltd. v. Sears, Roebuck & Co*., 6 F.3d 1058, 1065 (5th Cir. 1993) (citing *Chevron U.S.A., Inc. v. Martin Exploration Co*., 447 So.2d 469 (La. 1984)).[12] Louisiana jurisprudence also has recognized that "an agreement to agree is no agreement at all, since either party may avoid it by the mere failure to agree." *McNeely v. Town of Vidalia*, 157 La. 338, 342, 102 So. 422, 423 (1924). Summarizing Louisiana jurisprudence regarding preliminary agreements and agreements to agree, a commentator has observed:

> It is not uncommon for parties to enter into a preliminary or interim agreement prior to the execution of a more formal agreement. In these cases, the issue might arise whether the parties are bound prior to the execution of the later agreement or, in some cases, if the later agreement is never executed.
>
> One arguing against the existence of a binding agreement prior to the execution of the later, more formal or comprehensive agreement will urge that the first document is nothing more than an "agreement to agree" and that, without the confection of the second agreement, there is no binding contract. On the other hand, it may be argued that the parties are bound by the preliminary or interim agreement, notwithstanding that a more formal agreement has not been executed.
>
> The courts have held that "an agreement between parties, where their minds have met upon all essentials, constitutes a contract between them and binds them at once although they may have agreed that they would thereafter execute a formal instrument containing the terms of their present agreement." . . .

---

[12] In *Chevron*, the Louisiana Supreme Court observed that using the term preliminary, "by itself, does not necessarily connote a [tentative] or non-binding agreement. Preliminary, in its most general usage, implies something which precedes something else." 447 So.2d at 472. Continuing, the Supreme Court observed that the use of the word preliminary "does not preclude the agreement from being final until later agreements are reached, or from being the only agreement in the event no other agreements are confected." *Id.* Moreover, the Supreme Court rejected the argument that a preliminary agreement that envisioned subsequent agreements was not enforceable. Based on the language of the document at issue, the Supreme Court found it created binding commitments—despite that subsequent documents were to be confected—and that it was not an agreement to agree. *Chevron*, 447 So.2d at 473.

> Whether or not the parties intend to be bound if a subsequent written agreement is not executed is a question of fact.

Patrick S. Ottinger, *Principles of Contractual Interpretation*, 60 LA. L. REV. 765, 768 (2000) (internal footnotes omitted).

The gist of Archon's contention is that the settlement agreement recited on the record was an agreement to agree, not a valid and an enforceable compromise. Archon contends that Mr. Barrios understood from his phone conversation with Mr. Yorsch—NOLA Title's principal—on Sunday morning June 20, 2022 that the Recordings would be destroyed. Mr. Barrios testified that his understanding of the settlement that he reached with Mr. Yorsch was that it had three material terms: (i) payment of $375,000 by Archon to NOLA Title; (ii) destruction by NOLA Title of the Recordings; and (iii) dismissal of the suit.

According to Archon, the e-mails exchanged on Sunday following the telephone call between Mr. Barrios and Mr. Yorsch establish that the parties understood there would be a formal, written agreement. Archon contends the e-mails reflect that the parties understood the terms of such an agreement would be worked out after the March 21, 2022 court conference. Indeed, Archon points out that shortly after his telephone call with Mr. Yorsch, Mr. Barrios e-mailed Ms. Palowsky with instructions that "[t]here will be a paragraph addressing the [R]ecordings" in the written settlement agreement.

Consistent with the e-mails, Archon emphasizes that, on March 21, 2022, NOLA Title's counsel, Mr. Ormsby, qualified the recital of the settlement on the record. Mr. Ormsby stated that what the parties were putting on the record was merely "the fact of settlement" and "other terms" that were explicitly made "subject to a more formal agreement." Archon also emphasizes that the parties

never were able to confect a more formal, written agreement due to their inability to agree on the material terms.

NOLA Title counters that although its counsel (Mr. Ormsby) initially qualified the recital of the settlement on the record, this qualification was not repeated when—after the off-the-record telephone conversation between Ms. Palowsky and Archon's two executives (its CEO and COO)—the recitation of the settlement was restarted anew and completed. Regardless, NOLA Title points out that the reference to a "more formal agreement" was to the documents memorializing the deal—a release and closing documents. Indeed, the trial court judge observed, at the close of the conference, that he "expected a motion to dismiss the matter once all closing documents have been executed."

NOLA Title additionally counters that, by the morning of March 21, 2022, when the parties appeared before the trial court to recite their agreement on the record, the parties had reached a meeting of the minds. Otherwise, NOLA Title points out, this case would, and could, have proceeded to a three-day jury trial as scheduled. Thus, NOLA Title submits that the deal the parties agreed to was the one that they recited on the record on the cusp of the scheduled jury trial. We agree.

This scenario presented here is one in which the parties' contemplated, more formal, written documents—a release and closing documents—were "just tying up loose ends and where the failure to agree on them did not affect an otherwise valid settlement." *Stag v. Stuart H. Smith, LLC*, CV 18-3425, 2020 WL 1984336, at *4 (E.D. La. Apr. 27, 2020). Ms. Palowsky's testimony regarding her understanding of the terms of the settlement supports that the contemplated written documents in this case were simply meant to address ancillary issues.

Ms. Palowsky testified that the Recordings were an ancillary issue that the parties would have addressed in a release—not as part of the settlement recited on the record. But Ms. Palowsky explained that she and her firm were fired before the release could be finalized. Nonetheless, Ms. Palowsky testified that she was confident if she had not been fired and she "had done the red lines back and [she] had said, 'Freddy's got—Mr. Yorsch has to destroy the recordings' it would have been a nonissue as a part of the release." Ms. Palowsky equated a provision regarding the Recordings to a standard release provision, such as a choice-of-law provision.

Ms. Palowsky further testified that if the parties intended the Recordings to be a material term, when Mr. Barrios screamed at her on the phone on Sunday night about her misunderstanding of his e-mail regarding the payment schedule, Mr. Barrios also would have mentioned her failure to address the Recordings with Mr. Ormsby. She stressed that Mr. Barrios never had that verbal discussion with her.[13]

_____

[13] Ms. Palowsky testimony regarding the Recordings was as follows:

"We were told the settlement was 375. Mr. Barrios told us that, 375. All right. There was nothing said about -- There was nothing said about [the] [R]ecordings being a term of the settlement. I thought the—The settlement was what was put on the record. Is the release gonna have other things, like a choice-of-law provision, you know, all the standard things that make a release go from really being—it should be one page—being 10 pages? Did I think there was gonna be other things in the release and what -- If I had not been fired, would I have said, 'Oh, Geoffrey [Ormsby], we've got to put something about the [R]ecordings. You know, will Freddy [Yorsch] get rid of them? Will he destroy them?' Yes, would I have included that? Yes. But I did not think that would upset the settlement, because we had already discussed a few other things that had been raised about the release, the draft release that Mr. Ormsby sent. So to me, if the settlement had been -- If the [R]ecordings had been a main term in the settlement, when Mr. Barrios called me to scream at me about the payment schedule and my misunderstanding of his e-mail, that there would be—when I thought he said there would be one payment—there would be two payments at two different times, then, to me, he would have also relayed to me then: 'Hey, in your e-mail to Mr. Ormsby, where you said there would be one payment, you screwed that up. You

A factually similar scenario to the one presented here was addressed in *VACC, Inc. v. Davis*, 18-CV-03454-JCS, 2019 WL 1460201 (N.D. Cal. Apr. 2, 2019), *aff'd*, 823 Fed.Appx. 474 (9th Cir. 2020). There, the parties entered a purported settlement agreement on the record. Before and after doing so, one of the parties, VACC, was assured by its then counsel that a representation provision—a provision that the other party, Davis, had not taken VACC's proprietary information—would be included in the settlement agreement. But, the inclusion of a representation provision was neither mentioned to opposing counsel nor stated on the record as a term of the settlement. Thereafter, Davis' counsel e-mailed a draft settlement agreement to VACC. VACC, no longer represented by counsel, refused to sign the agreement because it lacked the representation clause. Litigation ensued. The district court found the settlement enforceable.

On appeal, VACC contended that the settlement recited on the record was an unenforceable agreement to agree because its terms were only preliminary and that the parties contemplated a formal, written settlement to finalize the agreement. The written agreement, VACC contended, would have included the representation clause. Rejecting these arguments, the appellate court observed that an objective standard applied to determine whether there was mutual consent—a meeting of the minds. Applying an objective standard, the appellate court observed:

> Even if Bayat subjectively (and reasonably) believed—based on the advice of counsel—that additional terms could be inserted into the settlement agreement at a later time, Bayat's objective words and actions at the settlement conference demonstrate that a binding agreement was made at that time. Nothing in Bayat's outward manifestations suggests an understanding that the oral settlement agreement would be contingent on the reduction of the agreement to

also screwed up 'cause you didn't tell him there would be a paragraph in the release about the [R]ecordings.' He didn't. There was no verbal discussion ever."

20

writing. Nor has VACC alleged that Davis or his attorneys knew of Bayat's request to add the representation clause in a follow-up written agreement. Accordingly, no allegation supports VACC's contention that the settlement conference was an unenforceable "agreement to agree."

*VACC*, 823 Fed.Appx. at 477. The appellate court further observed that "Davis anticipated a memorialization of the settlement agreement—not an entirely new settlement." *VACC*, 823 Fed.Appx. at 477, n. 2.

Louisiana jurisprudence, likewise, imposes an objective "meetings of the minds" standard; "[t]he mere lack of a subjective 'meeting of the minds' does not prevent formation of an enforceable contract." *Haygood v. Haygood*, 52,435, p. 4 (La. App. 2 Cir. 1/16/19), 264 So.3d 1226, 1230. Here, Mr. Barrios' subjective beliefs—that the Recordings were a material term of the settlement he agreed to and that there would be a formal, written settlement agreement incorporating that term—did not prevent the formation of a valid and an enforceable compromise. We, thus, find no manifest error in the trial court's finding that the terms recited on the record were a valid and an enforceable compromise.

*Missing Material Term*

When, as here, the compromise is placed on the record, the recital must make full disclosure of the material terms so that all parties involved are fully appraised of their rights and obligations. *Troxclair v. Parish of St. Charles*, 450 So.2d 759, 761 (La. App. 5th Cir. 1984). "A compromise is valid if there is a meeting of the minds between the parties as to exactly what they intended when the compromise was reached." *Tarver v. Oliver H. Van Horn Co., Inc.*, 591 So.2d 1366, 1369 (La. App. 4th Cir. 1991).

Archon contends a material term—the Recordings—was missing from the terms that the parties recited on the record; given this omission, it contends no

valid compromise was reached. Archon emphasizes that even the trial court concluded that "[t]hese tapes [the Recordings] obviously were a substantial issue, and the Court has now come to ascertain that they should have been part and parcel of the settlement. They were not." Archon's quote of the trial court's conclusion, however, is incomplete. The trial court's next sentence, following the quotation that Archon cites, states: "[t]hat's the issue." Viewed in context, the trial court was actually posing a question—whether the Recordings were a material term of the compromise—not making a conclusion that the Recordings were a material term.

Archon next argues that the e-mails exchanged between the parties before and after the March 21, 2022 conference establish a disagreement between them as to the material terms and, thus, the lack of a meeting of the minds. In support, Archon points out that its former counsel, Ms. Palowsky, advised NOLA Title's counsel, Mr. Ormsby, that Archon's CEO, Mr. Barrios, would "definitely have to include some other things" in the settlement agreement; and Mr. Barrios himself personally insisted that "[t]here will be a paragraph addressing the [R]ecordings." This argument is unpersuasive.

Archon acknowledges that its counsel did not communicate to NOLA Title that one of the things that Mr. Barrios needed and had instructed to be included in the settlement agreement was a provision addressing the Recordings. Rather, this was communicated only in an e-mail exchange between Mr. Barrios and his former counsel, Ms. Palowsky. Moreover, Mr. Barrios conceded that he never explained to Ms. Palowsky exactly how he wanted the issue of the Recordings to be addressed. In response to the question of what he expected, Mr. Barrios replied that he expected "[f]or [the Recordings] to go away. I mean, they pick their poison,

how they make it go away, but make sure they go away and there's recourse if they ever were to resurface."

Mr. Barrios also acknowledged that the Recordings were not mentioned in the multiple text messages that were exchanged between him and Mr. Yorsch in negotiating the settlement over the weekend before trial. Indeed, Mr. Barrios conceded that the only documentary proof of the parties' intent to include the Recordings as part of the settlement was the e-mail exchange between him and Ms. Palowsky. Again, in that e-mail exchange, he instructed Ms. Palowsky to include a paragraph in the settlement agreement addressing the Recordings; she replied to that e-mail: "[o]k on [the] [R]ecordings." But, as discussed elsewhere in this opinion, Ms. Palowsky testified that the Recordings were an ancillary issue—not a part of the settlement—that would have been handled in a release but for her and her firm being fired before the release could be completed.

Based on the evidence, we find no manifest error in the trial court's finding that the Recordings were not a material element of the settlement. We note, as NOLA Title contends, La. C.C. art. 3076 supports the trial court's finding; "[a] compromise settles only those differences that the parties clearly intended to settle, including the necessary consequences of what they express." La. C.C. ar. 3076. It is undisputed the Recordings are not relevant to the underlying dispute between the parties at issue in the case.

*Counsel's Lack of Express Authority to Settle*

Counsel's authority to settle requires the client's clear and express consent. *Tran*, 01-0675, p. 5, 806 So.2d at 106; *see also* La. C.C. art. 2997. Counsel's general authority, in an attorney-client relationship, to settle a client's case only

23

authorizes counsel to negotiate a settlement. *See Lemoine v. Thornton*, 13-889, p. 9 (La. App. 3 Cir. 2/12/14), 161 So.3d 666, 671.

Here, Archon emphasizes that none of its executives or officers was present at the March 21, 2022 court conference to state its acceptance on the record; Archon's only representative present at the conference was its former counsel. Archon contends that it neither approved nor authorized anybody to agree on behalf of Archon—including its former counsel--to a settlement that included only the terms recited on the record on March 21, 2022. Mr. Barrios attested to this fact in his affidavit. Given the inconsistency between Mr. Barrios' attestations that Ms. Palowsky lacked authority and Ms. Palowsky's representation on the record at the court conference that she had such authority, the trial court, on its own motion, set this matter for an evidentiary hearing to resolve the authorization issue.

At the evidentiary hearing, two witnesses testified—Mr. Barrios and Ms. Palowsky. The trial court posed to Mr. Barrios the core question of whether Archon authorized Ms. Palowsky to enter into the settlement recited on the record. Mr. Barrios' response was "Yeah, but not on those terms." Nonetheless, Mr. Barrios acknowledged that he agreed with the terms that were recited on the record. But he insisted there was a missing, material term—the Recordings. Moreover, Mr. Barrios testified that the Recordings were the entire basis for his willingness to settle. He further testified that he did not authorize Ms. Palowsky to settle without a provision addressing the Recordings.

Ms. Palowsky, in contrast, testified that she was authorized to enter into the settlement that was read into the record. Ms. Palowsky explained that she and Mr. Ormsby, NOLA Title's counsel, never discussed the Recordings as being a part of

24

the settlement that the parties were going to put on the record. Ms. Palowsky testified that "[t]he settlement was the money."

Ms. Palowsky also testified that the purpose of the off-the-record telephone call that she had with Mr. Rebeor and Ms. Barrios during the court conference was to clear up the payment terms, which were the heart of the deal.[14] As discussed elsewhere in this opinion, Ms. Palowsky characterized the Recordings as an ancillary issue that would have been handled in a release but for her firm being fired before the release could be completed.

At the close of the evidentiary hearing, the trial court—in again addressing the authorization issue and denying NOLA Title's request for attorney's fees for bringing the Motion to Enforce—observed:

> "[T]here is a genuine issue . . . whether or not . . . Ms. Palowsky had authority[] to enter into the settlement. . . .. It turns out nobody was lying. They told her she could settle for [$]375[,000]. The comment was: Recordings 'ok.' They were going to be dealt with in a release. And then [the Bezou Firm] [was] discharged. Another law firm [the Sher Garner Firm] came on, drew up a different release, changed the rules of the game.

The trial court determined that Ms. Palowsky was authorized to settle for the terms recited on the record. We cannot conclude the trial court was manifestly erroneous.

## CONCLUSION

The trial court's finding that there was a valid and an enforceable compromise agreement was essentially a finding that there was a meeting of the minds between the parties as to exactly what they intended at the time the compromise was recited on the record on March 21, 2022. In concluding there was a meeting of the minds, the trial court made three underlying factual findings. First,

---

[14] Mr. Barrios testified he did not recall being patched into the call during the court conference. He also testified that only he had authority to authorize a settlement on Archon's behalf. He testified that Mr. Rebeor lacked that authority.

it found that the material terms of the settlement were the terms recited on the record; the Recordings were not a material term. Second, it found that Archon expressly authorized Ms. Palowsky to approve the settlement recited on the record. Finally, it found that the parties, and the trial court, anticipated after the settlement was recited on the record that there would be further documentation memorializing the settlement agreement—not an entirely new settlement.[15] We find no manifest error in the trial court's factual findings.

## DECREE

For the foregoing reasons, we convert Archon's appeal into a supervisory writ application, grant the writ, but deny relief.

**APPEAL CONVERTED TO APPLICATION FOR SUPERVISORY WRIT; WRIT GRANTED; RELIEF DENIED**

---

[15] In its brief to this court, Archon acknowledged that it rejected NOLA Title's offer to return the Recordings. Archon's reasoning was that while NOLA Title offered, for the first time, to destroy the audio recordings at the July 18, 2022 evidentiary hearing, that offer was made after Archon had already incurred significant costs and fees in opposing a purported settlement agreement that did not address the Recordings. At that time, Archon was no longer willing to accept the terms of the prior settlement offer because of the additional fees and costs incurred. But, NOLA Title points out that Archon is now seeking to add provisions to the settlement that were not part of the original deal. The terms recited on the record made no mention of non-disparagement, attorneys' fees, or liquidated damages provisions or an unworkable warranty regarding the Recordings.